No. 20-11622

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ANTHONY SWAIN, ALEN BLANCO, BAYARDO CRUZ, RONNIEL FLORES,
WINFRED HILL, DEONDRE WILLIS, PETER BERNAL, INDIVIDUALLY AND ON BEHALF
OF ALL OTHERS SIMILARLY SITUATED,

*Plaintiffs-Appellees*,

*v.*

DANIEL JUNIOR, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF THE MIAMI-DADE
CORRECTIONS AND REHABILITATION DEPARTMENT, AND MIAMI-DADE COUNTY,

*Defendants-Appellants.*

Appeal from the United States District Court
for the Southern District of Florida,
No. 1:20-cv-21456 (Williams, J.)

**APPELLEES' PETITION FOR REHEARING
AND REHEARING EN BANC**

ALEC KARAKATSANIS
CIVIL RIGHTS CORPS
1601 Connecticut Avenue N.W.
Suite 800
Washington, D.C. 20009
(202) 681-2409
alec@civilrightscorps.org

July 13, 2020

DANIEL S. VOLCHOK
EMMA SIMSON
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue N.W.
Washington, D.C. 20006
(202) 663-6000
emma.simson@wilmerhale.com

*Swain v. Junior*, No. 20-11622

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1,

Appellees Anthony Swain, Alen Blanco, Bayardo Cruz, Ronniel Flores, Winfred

Hill, Deondre Willis, and Peter Bernal certify that persons and entities listed herein

have an interest in the outcome of this case.

1. Advancement Project, *Counsel for Plaintiffs-Appellees*

2. Barnet, Emily, *Counsel for Plaintiffs-Appellees* [motion to withdraw as counsel pending]

3. Bernal, Peter, *Plaintiff-Appellee*

4. Blanco, Alen, *Plaintiff-Appellee*

5. Buergel, Susanna M., *Counsel for Amici*

6. Civil Rights Corps, *Counsel for Plaintiffs-Appellees*

7. Cohen, Robert L., *Amicus Curiae*

8. Community Justice Project, *Counsel for Plaintiffs-Appellees*

9. Cruz, Bayardo, *Plaintiff-Appellee*

10. DLA Piper LLP (US), *Counsel for Plaintiffs-Appellees*

11. Dolovich, Sharon, *Amicus Curiae*

12. Dream Defenders, *Counsel for Plaintiffs-Appellees*

13. Giller, David, *Counsel for Amici*

14. Ginsberg, Betsy, *Amicus Curiae*

*Swain v. Junior*, No. 20-11622

15. Goldenson, Joseph, *Amicus Curiae*

16. Goodwin Proctor LLP, *Counsel for Amici*

17. Greenberg, Ezra S., *Counsel for Defendants-Appellants*

18. GST LLP, *Counsel for Plaintiffs-Appellees*

19. Harvey, Thomas B., *Counsel for Plaintiffs-Appellees*

20. Hill, Winfred, *Plaintiff-Appellee*

21. Hochstadt, Jennifer L., *Counsel for Defendants-Appellants*

22. Horn, Martin F., *Amicus Curiae*

23. Hubbard, Katherine, *Counsel for Plaintiffs-Appellees*

24. Jagannath, Meena, *Counsel for Plaintiffs-Appellees*

25. Jefferis, Danielle C., *Counsel for Amici*

26. Johnson, Darren W., *Counsel for Amici*

27. Junior, Daniel, *Defendant-Appellant*

28. Karakatsanis, Alec, *Counsel for Plaintiffs-Appellees*

29. Kim, Andrew, *Counsel for Amici*

30. Kimball-Stanley, David C., *Counsel for Amici*

31. Littman, Aaron, *Amicus Curiae*

32. Martin, Steve J., *Amicus Curiae*

33. Martinez-Flores, Ronniel, *Plaintiff-Appellee*

34. Miami-Dade County, *Defendant-Appellant*

*Swain v. Junior*, No. 20-11622

35. Miami-Dade County Attorney's Office, *Counsel for Defendants-Appellants*

36. Morgan, Richard, *Amicus Curiae*

37. Pacholke, Dan, *Amicus Curiae*

38. Pastor, Bernard, *Counsel for Defendants-Appellants*

39. Paul, Weiss, Rifkind, Wharton & Garrison LLP, *Counsel for Amici*

40. Pfaff, John, *Amicus Curiae*

41. Price-Williams, Abigail, *Miami-Dade County Attorney*

42. Ragsdale, Maya, *Counsel for Plaintiffs-Appellees*

43. Reinert, Alexander A., *Amicus Curiae*

44. Rodriguez-Taseff, Lida, *Counsel for Plaintiffs-Appellees*

45. Rosenthal, Oren, *Counsel for Defendants-Appellants*

46. Saleh, Sumayya, *Counsel for Amici Curiae*

47. Sanoja, Katherine Alena, *Counsel for Plaintiffs-Appellees*

48. Santos, Jaime Ann, *Counsel for Amici Curiae*

49. Schlanger, Margo, *Amicus Curiae*

50. Simson, Emma, *Counsel for Plaintiffs-Appellees*

51. Smith, R. Quinn, *Counsel for Plaintiffs-Appellees*

52. Southern Poverty Law Center, *Counsel for Amici Curiae*

53. Sparkman, Emmitt, *Amicus Curiae*

54. Stanley, Phil, *Amicus Curiae*

*Swain v. Junior*, No. 20-11622

55. Swain, Anthony, *Plaintiff-Appellee*

56. Torres, Hon. Edwin G., *United States Magistrate Judge*

57. Twinem, Alexandria, *Counsel for Plaintiffs-Appellees*

58. University of Denver Sturm College of Law – Student Law Office ǀ Civil Rights Clinic, *Counsel for Amici Curiae*

59. Vail, Eldon, *Amicus Curiae*

60. Viciana, Ana Angelica, *Counsel for Defendants-Appellants*

61. Volchok, Daniel S., *Counsel for Plaintiffs-Appellees*

62. Vosseler, Zach, *Counsel for Defendants-Appellants*

63. Williams, Brie, *Amicus Curiae*

64. Williams, Hon. Kathleen M., *United States District Judge*

65. Willis, Deondre, *Plaintiff-Appellee*

66. Wilmer Cutler Pickering Hale and Dorr, LLP, *Counsel for Plaintiffs-Appellees*

67. Yang, Tiffany, *Counsel for Plaintiffs-Appellees*

68. Zaron, Erica, *Counsel for Defendants-Appellants*

The undersigned certifies that no publicly traded company or organization is known to have an interest in the outcome of this case or appeal.

/s/ Emma Simson
EMMA SIMSON

## RULE 35-5 STATEMENT

I express a belief, based on a reasoned and studied professional judgment, that the panel decision is contrary to the following decisions of the Supreme Court and this Court, and that consideration by the full court is thus necessary to secure and maintain uniformity of decisions in this Court:  *Brown v. Plata*, 563 U.S. 493 (2011); *Smith v. Sullivan*, 611 F.2d 1039 (5th Cir. 1980); and *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999).

I further express a belief, based on a reasoned and studied professional judgment, that this appeal involves the following questions of exceptional importance:  (1) whether a defendant's lack of state-law authority to rectify a dangerous prison condition precludes a federal court from finding the defendant deliberately indifferent and thus from remedying the inhumane condition; and (2) whether a defendant can be found to have recklessly disregarded a serious risk of harm where the defendant has pursued a number of measures of limited effectiveness while knowingly failing to pursue the single most effective means of mitigating the risk.

/s/  Emma Simson
EMMA SIMSON

## TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT ..................................................................C-1

RULE 35-5 STATEMENT ........................................................................ i

TABLE OF AUTHORITIES ................................................................... iii

INTRODUCTION ...................................................................................1

ISSUES PRESENTED.............................................................................2

STATEMENT .........................................................................................3

ARGUMENT ..........................................................................................6

I.    THE MERITS AND STAY DECISIONS SHOULD BE VACATED BECAUSE
      THE APPEAL IS MOOT ....................................................................6

      A.    The Appeal Is Now Moot....................................................6

      B.    The Mooting Of The Appeal Requires Vacatur....................9

II.   REHEARING IS WARRANTED IF THE PANEL DECISION IS NOT
      VACATED........................................................................................12

      A.    A Jailer's Lack Of State-Law Authority Does Not
            Preclude A Deliberate-Indifference Finding.......................13

      B.    The Panel Decision Conflicts With *McElligott v. Foley*....................16

CONCLUSION ......................................................................................17

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Alabama State Conference of the NAACP v. Alabama*, 806 F. App'x 975 (11th Cir. 2020) ...................................................................12

*Alvarez v. Smith*, 558 U.S. 87 (2009).........................................................11

*Attorney General of Guam v. Thompson*, 441 F.3d 1029 (9th Cir. 2006) ..................................................................................................10

*Azar v. Garza*, 138 S. Ct. 1790 (2018) ....................................................11

*BankWest, Inc. v. Baker*, 446 F.3d 1358 (11th Cir. 2006).........................6

*Berry v. Peterman*, 604 F.3d 435 (7th Cir. 2010)....................................17

*Brooks v. Georgia State Board of Elections*, 59 F.3d 1114 (11th Cir. 1995) ..........................................................................................6, 7, 8, 9

*Brown v. Plata*, 563 U.S. 493 (2011).....................................................2, 13

*Camreta v. Greene*, 563 U.S. 692 (2011) .................................................10

*Democratic Executive Committee of Florida v. National Republican Senatorial Committee*, 950 F.3d 790 (11th Cir. 2020)...................11

*Dow Jones & Co. v. Kaye*, 256 F.3d 1251 (11th Cir. 2001)......................8

*Ethredge v. Hail*, 996 F.2d 1173 (11th Cir. 1993).....................................9

*Ex parte Young*, 209 U.S. 123 (1908)......................................................15

*Hand v. DeSantis*, 946 F.3d 1272 (11th Cir. 2020) .................................11

*Harris v. Thigpen*, 941 F.2d 1495 (11th Cir. 1991)............................13, 14

*In re Ghandtchi*, 705 F.2d 1315 (11th Cir. 1983).....................................10

*McElligott v. Foley*, 182 F.3d 1248 (11th Cir. 1999) ...........................2, 16

*Smith v. Jenkins*, 919 F.2d 90 (8th Cir. 1990) .........................................17

*Smith v. Sullivan*, 611 F.2d 1039 (5th Cir. 1980) .........................................2, 13, 15

*Steele v. Shah*, 87 F.3d 1266 (11th Cir. 1996) ........................................................16

*Swain v. Junior*, 958 F.3d 1081 (11th Cir. 2020) .....................................................4

*U.S. Bancorp Mortgage Co. v. Bonner Mall Partnership*, 513 U.S. 18
    (1994)..................................................................................................................9

*United States v. Caraway*, 483 F.2d 215 (5th Cir. 1973) .......................................10

*United States v. Munsingwear, Inc.*, 340 U.S. 36 (1950) .......................................10

*United States v. Schaffer*, 240 F.3d 35 (D.C. Cir. 2001) .......................................10

*United States v. Secretary, Florida Department of Corrections*,
    778 F.3d 1223 (11th Cir. 2015) ...............................................................6, 7, 8

*Victory v. Berks County*, 789 F. App'x 328 (3d Cir. 2019)......................................8

*Waldrop v. Evans*, 871 F.2d 1030 (11th Cir. 1989)................................................16

*West v. Keve*, 571 F.2d 158 (3d Cir. 1978)..............................................................17

*Williams v. Bennett*, 689 F.2d 1370 (11th Cir. 1982).............................................13

## DOCKETED CASES

*Alabama State Conference of the NAACP v. Alabama*, No. 17-14443
    (11th Cir.) ........................................................................................................12

## STATUTES, RULES, AND REGULATIONS

Prison Litigation Reform Act, 18 U.S.C. §3626.............................................8, 14, 15

42 U.S.C. §1983 .......................................................................................................3, 4

Fed. R. Civ. P. 6 .......................................................................................................4, 7

## INTRODUCTION

This appeal involves matters of the gravest importance: literally life and death. It concerns federal courts' ability to provide redress when presumptively innocent pre-trial detainees are subjected to life-threatening conditions of confinement—here, conditions facilitating the rapid spread of COVID-19.

After holding multiple hearings and receiving extensive evidence, the district court issued a preliminary injunction, finding that plaintiffs (medically vulnerable detainees) would likely succeed on their conditions-of-confinement claim and suffer irreparable harm absent injunctive relief. A divided motions panel of this Court, however, stayed the injunction, and a divided merits panel then vacated the injunction on the day it expired, based on rulings that conflict with binding precedent and leave the government free to subject individuals under its control to inhumane, even deadly, conditions.

Although the panel decisions would normally justify full court review, the appeal is now moot because the preliminary injunction has expired, meaning plaintiffs have lost the opportunity to obtain review of those decisions. Vacatur is therefore warranted.

If, however, the Court concludes that the appeal is not moot, then it should grant rehearing because the decision is erroneous and dangerous, in two principal respects. *First*, aspects of the decision suggest that a jailer who lacks state-law

authority to remedy an intolerably dangerous condition of confinement cannot be found deliberately indifferent, in contravention of *Brown v. Plata*, 563 U.S. 493 (2011), and *Smith v. Sullivan*, 611 F.2d 1039 (5th Cir. 1980). Those aspects risk a dangerous shift in the law that would make the constitutionality of prison conditions turn on state and local policy choices and render federal courts powerless to enjoin conditions that pose known and serious risks of harm.

*Second*, the decision conflicts with *McElligott v. Foley*, 182 F.3d 1248 (11th Cir. 1999), which held that "a decision to take an easier but less efficacious course of treatment" can establish deliberate indifference, *id.* at 1255. Without addressing *McElligott* (which plaintiffs cited repeatedly), the panel held that defendants' failure to ensure social distancing at their jail—a measure the record established is essential to mitigating the risk COVID-19 poses—does not constitute deliberate indifference because defendants have adopted several other, far less effective measures. *See* Op.22-24, 26-27. Review is therefore necessary to maintain uniformity in this Court's cases.

## ISSUES PRESENTED

(1)  Whether vacatur of the merits-panel and stay-panel decisions is warranted because the appeal is moot; and

(2)  If the Court concludes the appeal is not moot:

- whether a defendant's lack of state-law authority to rectify an intolerably dangerous condition precludes finding the defendant deliberately indifferent and thereby precludes prospective judicial relief;

- whether a defendant who has undertaken *some* steps to mitigate an intolerable condition of confinement can be found deliberately indifferent, if the steps are known to be insufficient to avert serious harm and other known and far more efficacious measures are available.

## STATEMENT

Plaintiffs, pre-trial detainees at Metro West Detention Center in Miami, filed this suit against Miami-Dade County and Daniel Junior, director of the Miami-Dade Corrections and Rehabilitation Department.  Plaintiffs alleged, under 42 U.S.C. §1983, that defendants were violating the Fourteenth Amendment by acting with deliberate indifference to the serious risk of harm that COVID-19 poses to Metro West detainees, many of whom are medically vulnerable.  Plaintiffs submitted extensive evidence that defendants know COVID-19 is a highly contagious and potentially lethal disease yet have failed to undertake measures necessary to reduce COVID-19's spread within the jail, including failing to reduce the population density to enable social distancing (which the record establishes is essential to prevent widespread infection).

Based on the evidence, the district court granted a preliminary injunction. As relevant here, it concluded that plaintiffs would likely succeed on their §1983 claim because defendants continue to confine people in conditions that do not allow for essential distancing. The injunction—which from the outset was set to expire Monday, June 15, R.100 at 52; Fed. R. Civ. P. 6(a)—required defendants to undertake basic measures to try to slow COVID-19's spread.

Defendants appealed and sought a stay, which a divided motions panel granted. *Swain v. Junior*, 958 F.3d 1081 (11th Cir. 2020). A divided merits panel—following briefing, argument, and supplemental briefing on whether the appeal would become moot on June 15—then vacated the injunction on June 15, noting that it had expedited its decision because of "uncertainties" regarding mootness. Op.3 n.1.

Addressing plaintiffs' likelihood of success, the merits panel noted that plaintiffs' claim requires showing both that COVID-19 poses a "'substantial risk of serious harm'" and that defendants acted with deliberate indifference to that risk, which in turn requires proving that defendants knew of the risk and disregarded it by conduct more culpable than negligence. Op.14. The panel acknowledged that defendants do not contest either the seriousness of the risk COVID-19 poses, or that they are aware of the risk; they deny only that their response reflects reckless disregard. Op.14-15. In the panel's view, the district court deemed defendants'

-4-

response unreasonable based solely on the exponential rate of infections at Metro West and defendants' failure "to do the 'impossible'" and implement social distancing at the cramped jail. Op.18-20. The panel deemed such reasoning erroneous because, in its view, "[n]either the resultant harm of increasing infections nor the impossibility of achieving six-foot social distancing in a jail environment establishes that the defendants acted" recklessly. Op.18. The panel further concluded that—setting aside the parties' factual disputes about whether defendants have implemented the testing, quarantining, and hygiene measures they claim (as the district court had)—defendants responded reasonably to the risk, i.e., their failure to ensure social distancing does not reflect a reckless disregard of the risk given these other steps. Op.21-24.

Dissenting, Judge Martin concluded that plaintiffs will likely succeed on their claim because the record shows that defendants "willfully incarcerated people" at population levels "they knew to be unsafe," i.e., "knowingly maintained conditions that placed detainees at an impermissibly high risk of illness and death." Op.38. Responding to the majority's analysis, she wrote that Junior's undertaking of "some steps to reduce the risk of COVID-19 does not excuse his failure to take the most important step for ensuring detainee safety"—ensuring social distancing—and that his lack of state-law authority to reduce the jail population to a safe level does not preclude finding deliberate indifference. Op.40-44.

**ARGUMENT**

## I.   THE MERITS AND STAY DECISIONS SHOULD BE VACATED BECAUSE THE APPEAL IS MOOT

The panel ruled on the validity of the preliminary injunction the day it expired, meaning the appeal is now moot.  The panel decision and stay decision preceding it must therefore be vacated, because plaintiffs have been denied an opportunity to obtain further review of those decisions.[1]

### A.   The Appeal Is Now Moot

Federal courts can adjudicate only "live" cases and controversies; they cannot issue advisory opinions resolving moot issues.  *BankWest, Inc. v. Baker*, 446 F.3d 1358, 1364, 1367 (11th Cir. 2006).  "An appeal is moot when, by virtue of an intervening event, a court of appeals cannot grant any effectual relief whatever in favor of the appellant."  *Florida Department of Corrections*, 778 F.3d at 1228 (quotation marks omitted).  "This court has consistently held that the appeal of a preliminary injunction is moot where the effective time period of the injunction has passed."  *Brooks v. Georgia State Board of Elections*, 59 F.3d 1114, 1119 (11th Cir. 1995).  That is because where an injunction has expired, it "no longer has legal effect on the parties, and a decision by this court affirming or

---

[1] Plaintiffs have no objection to vacatur of the district court's preliminary-injunction decision as well, on the same ground.  *See United States v. Secretary, Florida Department of Corrections*, 778 F.3d 1223, 1230 (11th Cir. 2015).

vacating the defunct injunction cannot affect the [litigants'] rights." *Florida Department of Corrections*, 778 F.3d at 1229 (quotation marks omitted).

Here, the April 29 preliminary injunction states that its "injunctive provisions … shall expire 45 days from the date of th[e] Order." R.100 at 52. Hence, by operation of its terms and Federal Rule of Civil Procedure 6(a), the injunction expired June 15, the day the merits panel issued its decision. As a result, this Court now lacks jurisdiction to adjudicate the parties' rights, and plaintiffs cannot secure further substantive review from this Court or the Supreme Court. *See Florida Department of Corrections*, 778 F.3d at 1227 (court must dismiss appeal in prison-conditions case where preliminary injunction expired).

In post-argument briefing, defendants argued that if the appeal is moot, two mootness exceptions apply. Neither one does.

*First*, defendants contended (Supp. Br. 2) that the appeal presents issues "capable of repetition, yet evading review." But that "rare exception" applies only where there is a "reasonable expectation" that "the same controversy will recur" and the "challenged action is in its duration too short to be fully litigated prior to its … expiration." *Brooks*, 59 F.3d at 1120-1121. That is not the case here. Although the Prison Litigation Reform Act (PLRA) provides that preliminary injunctions relating to prison conditions automatically expire 90 days after entry, that is not the case if the district court makes specified findings and finalizes its

order before then.  18 U.S.C. §3626(a)(2).  And this Court's decision in *Florida Department of Corrections* makes clear that this provision is insufficient reason to find the capable-of-repetition exception applicable here.  Confronted there with an expired preliminary injunction that was likewise governed by the PLRA, the Court concluded that even if the district court would likely enter a second injunction, there was "no reasonable expectation that any new preliminary injunction would expire before it reached this Court on appeal."  778 F.3d at 1229 (quotation marks omitted).  It wrote: "There is no basis for us to predict that if [the plaintiffs] seek[] a new preliminary injunction, the district court (assuming it grants the motion) will decline to make the required need-narrowness-intrusiveness findings" or refrain from entering an injunction of sufficient duration to allow for review.  *Id.*; *cited in Victory v. Berks County*, 789 F. App'x 328, 333 n.5 (3d Cir. 2019).  The same is true here, particularly given that plaintiffs seek a final injunction.  There is, in short, nothing about the nature of plaintiffs' claims or the type of relief requested that renders any future dispute "inherently" too short to be fully litigated prior to it becoming moot, *Dow Jones & Co. v. Kaye*, 256 F.3d 1251, 1258 (11th Cir. 2001).

*Second*, defendants invoked (Supp. Br. 4) the "all necessary steps" mootness exception, which applies where "an appellant has taken all steps necessary to perfect the appeal and to preserve the status quo before the dispute becomes moot," *Brooks*, 59 F.3d at 1121.  But that exception is "extremely narrow," "limited

primarily to criminal defendants who seek to challenge their convictions notwithstanding that they have been released from custody." *Id.* at 1119. "The fundamental argument for review in such cases is that the stigma of conviction of itself justifies review." *Ethredge v. Hail*, 996 F.2d 1173, 1177 (11th Cir. 1993) (brackets omitted). That limitation on the exception's scope, this Court has explained, is "only logical," because "[t]o review every otherwise-moot case simply because the appellant took all necessary steps to prevent the case from becoming moot would be to graft a fault requirement onto the doctrine of mootness" and "water down the doctrine almost to the point of impotence." *Id.* Defendants cited no authority or principle supporting application or extension of that exception to this civil case.

## B.    The Mooting Of The Appeal Requires Vacatur

Because the appeal is now moot, plaintiffs have been "prevented through happenstance" from seeking further review of the panel's adverse holdings. *U.S. Bancorp Mortgage Co. v. Bonner Mall Partnership*, 513 U.S. 18, 23 (1994). Vacatur of the panel decision and the stay decision preceding it is therefore warranted. As the Supreme Court has explained, "[a] party who seeks review of the merits of an adverse ruling, but is frustrated by the vagaries of circumstance, ought not in fairness be forced to acquiesce in the judgment." *Id.* at 25. Vacatur

appropriately "clears the path for future relitigation of the issues," *United States v. Munsingwear, Inc.*, 340 U.S. 36, 40 (1950).

Vacatur is also appropriate to prevent an unreviewable decision from "spawning … legal consequences" beyond the parties' specific dispute. *Camreta v. Greene*, 563 U.S. 692, 713 (2011). In particular, the merits panel decision (as discussed below) departs from precedent and could result in deeply disturbing consequences for the law governing conditions-of-confinement claims.

That the appeal became moot only after the merits panel issued its decision is irrelevant. This Court has recognized that vacatur is appropriate "where mootness occurred after an appellate court had issued a decision but before the losing party could seek en banc reconsideration." *In re Ghandtchi*, 705 F.2d 1315, 1316 (11th Cir. 1983) (per curiam); *see also United States v. Caraway*, 483 F.2d 215, 216 (5th Cir. 1973) (en banc) (per curiam) (citing *Munsingwear*). So have other circuits. For instance, the en banc D.C. Circuit has explained that "[w]hen a case becomes moot on appeal, whether it be during initial review or in connection with consideration of a petition for rehearing or rehearing *en banc*, this court generally vacates the District Court's judgment, vacates any outstanding panel decisions, and remands to the District Court." *United States v. Schaffer*, 240 F.3d 35, 38 (D.C. Cir. 2001) (en banc) (per curiam); *accord Attorney General of Guam v. Thompson*, 441 F.3d 1029, 1030 (9th Cir. 2006). The Supreme Court, too, has

vacated court of appeals decisions where the appeals became moot before the parties had an opportunity to obtain Supreme Court review. *E.g.*, *Azar v. Garza*, 138 S.Ct. 1790, 1792-1793 (2018) (per curiam); *Alvarez v. Smith*, 558 U.S. 87, 94-97 (2009). The same relief is warranted here.[2]

This Court's cases rejecting vacatur, by contrast, have involved very different circumstances. In two recent cases, for example, the Court declined to vacate stay decisions because it concluded that they could not "spawn binding legal consequences regarding the merits of the case." *Democratic Executive Committee*, 950 F.3d at 795; *accord Hand v. DeSantis*, 946 F.3d 1272, 1275 n.5 (11th Cir. 2020). Moreover, in each instance, the entire *case* had become moot while on appeal (because the legislature amended the relevant statute). *Democratic Executive Committee*, 950 F.3d at 792; *Hand*, 946 F.3d at 1274-1275. Here, in contrast, the case is not moot, only the appeal is. Absent vacatur, therefore, the merits and stay panel decisions' unreviewed statements of law and fact risk having an outsized impact on future proceedings in this case.

This Court also recently rejected vacatur, over a dissent, of a panel decision resolving an interlocutory appeal regarding Alabama's immunity from suit.

---

[2] As these decisions confirm, mootness deprives federal courts of power to rule on the *merits* of a case but does not preclude vacatur. *See Democratic Executive Committee of Florida v. National Republican Senatorial Committee*, 950 F.3d 790, 794 (11th Cir. 2020) (per curiam) (citing *U.S. Bancorp*).

*Alabama State Conference of NAACP v. Alabama*, 806 F. App'x 975, 975 (11th Cir. 2020) (per curiam) (mem.).  The parties agreed the appeal became moot after the panel decision issued, because the district-court proceedings had concluded and Alabama's immunity from suit no longer presented a live issue.  Although the panel did not explain its reasons for rejecting Alabama's vacatur request, the equities did not favor vacatur there:  Alabama concededly wanted a decision on the merits of the plaintiffs' claims and thus participated in the district court proceedings without ever seeking to stay the proceedings (which would have preserved its immunity claim).  *See* Appellees' Response to Motion to Vacate 2, 4-5, *Alabama State Conference of NAACP v. Alabama*, No. 17-14443 (Mar. 11, 2020).  Here, however, plaintiffs have been deprived of an opportunity for review through no fault of their own.  Vacatur is warranted.

## II.    REHEARING IS WARRANTED IF THE PANEL DECISION IS NOT VACATED

If the Court concludes the appeal is not moot, the panel should vacate its deliberate-indifference analysis because it conflicts with Supreme Court and circuit precedent and was unnecessary to the decision (the panel having concluded that the injunction should also be vacated because the district court failed to address two other threshold issues, Op.28-33).  If the panel declines to do so, the full Court should grant rehearing to address the panel's deliberate-indifference analysis, which could bring about a sea change in the law.

-12-

### A.    A Jailer's Lack Of State-Law Authority Does Not Preclude A Deliberate-Indifference Finding

One of defendants' principal arguments has been that Junior cannot be held deliberately indifferent for confining people at an unreasonably dangerous population density because he lacks state-law authority to release people. Binding precedent, however, rejects that argument as to official-capacity claims for injunctive relief (as opposed to personal-capacity claims seeking damages, *see Williams v. Bennett*, 689 F.2d 1370, 1383, 1388-1389 (11th Cir. 1982)).

In *Brown v. Plata*, for instance, the Supreme Court upheld a prisoner-release order as a remedy for systemic conditions-of-confinement violations, even though the named defendants did not necessarily have the authority to remedy the conditions. *See* 563 U.S. at 526-529; *see also* Op.44 (Martin, J., dissenting) (arguing that the majority's decision contravenes *Brown*).

Similarly, in *Smith v. Sullivan*, the former Fifth Circuit held that the district court could impose a ceiling on a jail's population even though the ceiling "would require the sheriff to violate his statutory duty to accept prisoners and [require] the commissioners court to violate its duty to stay within [state-law] spending limits." 611 F.2d at 1043. Indeed, *Smith* deemed it "well established that inadequate funding will not excuse the perpetuation of unconstitutional conditions of confinement; nor will an allegedly contrary duty at state law." *Id.* at 1043-1044 (citations omitted). And in *Harris v. Thigpen*, 941 F.2d 1495 (11th Cir. 1991), this

-13-

Court held that state-imposed resource constraints "will not excuse the failure of correctional systems to maintain a certain minimum level of medical service necessary to avoid … cruel and unusual punishment," and that a court can find systemic deliberate indifference and provide judicial redress even if the named defendants do not have authority to rectify the situation, *id.* at 1509.

Congress, too, has recognized that federal courts will sometimes find conditions-of-confinement violations where defendants lack state-law authority to rectify the challenged conditions. The PLRA provides that federal courts "shall not order any prospective relief that requires or permits a government official to exceed his or her authority under State or local law" unless certain conditions are first met. 18 U.S.C. §3626(a)(1)(B). If a defendant's lack of state-law authority precluded finding deliberate indifference, this provision would make no sense.

Here, the panel stated that it assumed a defendant can be found deliberately indifferent for failing to take an action outside the scope of the defendant's state-law authority. Op.26-27. But it then held that the district court erred in finding Junior deliberately indifferent for "[f]ailing to do the 'impossible'" and not implement social distancing within the cramped jail. Op.20. It is "impossible" for Junior to implement necessary distancing, however, *only* because he lacks state-

law authority to release people; he has the physical means to reduce the jail population.[3]

The panel did not try to reconcile its conclusion with *Plata* or the PLRA; it did not even cite either. Nor did it offer any explanation for its assertion that *Smith* merely "suggests," rather than holds, that "'an allegedly contrary duty at state law' won't 'excuse the perpetuation of unconstitutional conditions of confinement.'" Op.27 n.7 (quoting *Smith*, 611 F.2d at 1043-1044).[4]

Absent rehearing, there is a significant risk that the panel's decision will be read as holding that a defendant's lack of state-law authority to take an action (what the panel calls doing the "impossible") excuses the defendant's failure to act,

---

[3] Because of the PLRA, even if plaintiffs establish a constitutional violation based on the jail's high population density, they would still have to overcome onerous hurdles to obtain a detainee-release order as a *remedy*. 18 U.S.C. §3626(a)(3).

[4] The panel instead voiced skepticism in a footnote about plaintiffs' position, stating that "legal authority must have some bearing" in the deliberate-indifference inquiry because otherwise "any person with physical capacity to provide relief to an inmate—say, a custodian at Metro West—[could] be deemed deliberately indifferent for failing to do so." Op.27 n.7. But even setting aside that concerns about the scope of potential defendants could not justify disregarding binding precedent, the panel never explained why such concerns are not fully addressed by other elements of the deliberate-indifference inquiry, such as knowledge of both the relevant risk and measures to reduce that risk, or by limitations on who constitutes a proper defendant for prospective relief under *Ex parte Young*, 209 U.S. 123 (1908). Nor did the panel address the appropriateness of allowing the standard for constitutional conditions to turn on state and local policy choices about individuals' authority.

-15-

even in a suit for prospective relief. Indeed, the dissent read the decision that way, Op.40, 42 (Martin, J., dissenting).

If so read, the decision would change constitutional law in deeply disturbing ways: For example, if a jailer learned that a levee was about to break and flood a jail, killing everyone detained inside, the jailer could not be found deliberately indifferent for failing to move or release people if the jailer lacked state-law authority to do so—and a federal court would be powerless to find a constitutional violation and provide relief. That cannot be the law, and if this case is not moot, review is warranted to avoid such an unprecedented and unjustifiable result.

## B. The Panel Decision Conflicts With *McElligott v. Foley*

The panel decision also departs from *McElligott*. The Court there—reaffirming circuit precedent—held that it constitutes deliberate indifference "to take an easier but less efficacious" response to a serious risk of harm. 182 F.3d at 1255 (citing *Steele v. Shah*, 87 F.3d 1266, 1269-1270 (11th Cir. 1996), and *Waldrop v. Evans*, 871 F.2d 1030, 1035 (11th Cir. 1989)). The panel here held the opposite: that Junior's failure to ensure essential social distancing did not constitute deliberate indifference (despite his awareness that distancing is critical to mitigate COVID-19's transmission) because he had adopted other, far less effective measures in response to the risk. Op.26-27. The panel did not reconcile its holding with *McElligott*; indeed, it never so much as cited the case, even though

-16-

plaintiffs' brief cited it repeatedly, and the dissent cited it too. (Defendants' reply brief likewise ignored *McElligott*.)[5]

It is *McElligott*, not the panel's decision here, that is sound. Under the panel's decision, government officials would be free to withhold a low-cost and highly effective COVID-19 vaccine so long as they had instead undertaken other measures (such as instituting temperature screenings) that they knew were far less effective and would result in far greater sickness and death. The law does not condone such an inhumane result, and rehearing is warranted to correct the majority's misguided—and life-threatening—decision that it does.

## CONCLUSION

This Court should grant the petition and vacate the prior panel decisions. Alternatively, either the panel should grant rehearing and vacate the deliberate-indifference analysis or the full Court should grant rehearing and set the case for briefing and argument.

---

[5] The panel's decision also departs from decisions of other circuits. *See, e.g.*, *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010); *Smith v. Jenkins*, 919 F.2d 90, 93 (8th Cir. 1990); *West v. Keve*, 571 F.2d 158, 162 (3d Cir. 1978).

Respectfully submitted,

/s/ Emma Simson

ALEC KARAKATSANIS                    DANIEL S. VOLCHOK
CIVIL RIGHTS CORPS                   EMMA SIMSON
1601 Connecticut Avenue N.W.         WILMER CUTLER PICKERING
Suite 800                               HALE AND DORR LLP
Washington, D.C. 20009               1875 Pennsylvania Avenue N.W.
(202) 681-2409                       Washington, D.C. 20006
alec@civilrightscorps.org            (202) 663-6000
                                     emma.simson@wilmerhale.com

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure ("FRAP") 32(g), I certify that this brief complies with the type-volume limitation of FRAP 35(b)(2)(A) and FRAP 40(b)(1).

1.    Exclusive of the exempted portions of the brief, the brief contains 3,890 words.

2.    As permitted by FRAP 32(g)(1), I have relied upon the word-count feature of this word-processing system in preparing this certificate.

/s/ Emma Simson
EMMA SIMSON

## CERTIFICATE OF SERVICE

On this 13th day of July, I filed the foregoing with the Court using the appellate CM/ECF system, which will serve counsel for all parties to this appeal.

/s/ Emma Simson
EMMA SIMSON

ADDENDUM

[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 20-11622
_____

D.C. Docket No. 1:20-cv-21457-KMW

ANTHONY SWAIN,
ALEN BLANCO,
BAYARDO CRUZ,
RONNIEL FLORES,
WINFRED HILL,
et al.,

Plaintiffs - Appellees,

versus

DANIEL JUNIOR,
MIAMI-DADE COUNTY, FLORIDA,

Defendants - Appellants.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(June 15, 2020)

Before MARTIN and NEWSOM, Circuit Judges, and WATKINS,[*] District Judge.

NEWSOM, Circuit Judge:

It would be a colossal understatement to say that the COVID-19 pandemic has had far-reaching effects. It has changed everything from the way that friends and families interact to the way that businesses and schools operate to the way that courts hear and decide cases. The virus, though, poses particularly acute challenges for the administration of the country's jails and prisons. Because incarcerated inmates are necessarily confined in close quarters, a contagious virus represents a grave health risk to them—and graver still to those who have underlying conditions that render them medically vulnerable. And for their part, prison officials are faced with the unenviable (and often thankless) task of maintaining institutional order and security while simultaneously taking proper care of the individuals in their custody.

Our plaintiffs here—a group of medically vulnerable inmates—challenged the conditions of their confinement at Miami's Metro West Detention Center. In particular, they assert that Miami-Dade County and Daniel Junior, the Director of the Miami-Dade Corrections and Rehabilitations Department, have inadequately responded to the COVID-19 outbreak and thereby violated their constitutional

---

[*] Honorable W. Keith Watkins, United States District Judge for the Middle District of Alabama, sitting by designation.

rights.  Holding that the plaintiffs were likely to succeed on the merits of their claim and would suffer irreparable injury in the absence of immediate relief, the United States District Court for the Southern District of Florida enjoined the county and Junior to take a number of precautionary measures to halt the virus' spread and ordered them to file regular reports regarding the virus' status.

A motions panel of this Court stayed the injunction pending resolution of the defendants' appeal.  After considering the merits, and with the benefit of outstanding written briefs and oral arguments, we now conclude that the district court erred in issuing the injunction.[1]  Accordingly, we vacate the injunction and remand the case to the district court.

---

[1] For good reason, we have expedited the resolution of this case and the publication of this opinion.  The district court issued its order on April 29, 2020, granting a preliminary injunction "for a period of 45 days."  A motions panel of this Court stayed the injunction on May 5, promulgated a condensed briefing schedule, and directed the Clerk to expedite the appeal for merits disposition and to schedule oral argument before the first available argument panel.  *See Swain v. Junior*, 958 F.3d 1081, 1092 (11th Cir. 2020).  Immediately after oral argument on June 9, we asked the parties to address (1) whether this appeal would become moot on June 15, the Monday following the expiration of the 45-day time period on Saturday, June 13, *see* Fed. R. Civ. P. 6(a), and (2) whether the motions panel's stay order tolled the injunction's 45-day period. The parties responded (in less than 24 hours) with very capable supplemental briefs that, perhaps not surprisingly, reached diametrically opposite conclusions.  In light of the uncertainties surrounding the mootness issue—and because the parties, who have fully and skillfully briefed and argued the case, are entitled to a decision on the merits—we deemed it prudent to issue this opinion before the injunction was set to expire.

# I

## A

This litigation began on April 5, 2020, when plaintiffs Anthony Swain, Alen Blanco, Bayardo Cruz, Ronniel Flores, Winfred Hill, Deondre Willis, and Peter Bernal—medically vulnerable pretrial detainees at Metro West Detention Center in Miami, Florida—filed a class-action complaint against Miami-Dade County and Daniel Junior in his official capacity as Director of the Miami-Dade Corrections and Rehabilitation Center.[2]  They sought to represent themselves, a class of "all current and future persons detained at Metro West during the . . . pandemic," and a subclass of medically vulnerable detainees.  The plaintiffs asked for declaratory and injunctive relief under 42 U.S.C. § 1983, alleging that the defendants had violated (and were continuing to violate) the Eighth and Fourteenth Amendments by acting with "deliberate indifference" to the serious risk posed by COVID-19.  In particular, the plaintiffs asserted that "Metro West has neither the capacity nor the ability to comply with public health guidelines to prevent an outbreak of COVID-19 and cannot provide for" their safety.  More particularly still, the plaintiffs claimed that the defendants didn't "give [them] the ability to practice safe social distancing" and that "conditions force[d] them to sit, stand, walk, eat, and sleep

---

[2] Hill and Bernal have both been released from custody.  Unfortunately, the plaintiffs learned during the pendency of this appeal that one of the putative class members, Charles Hobbs, had died from COVID-related complications.

within six feet of another person," and, furthermore, that the defendants weren't providing adequate cleaning supplies or "free hygiene or personal sanitation supplies." On behalf of the medically vulnerable subclass, the plaintiffs separately petitioned for a writ of habeas corpus under 28 U.S.C. § 2241, seeking immediate release. Along with their complaint, the plaintiffs also filed an emergency motion for a temporary restraining order and a preliminary injunction, as well as a motion to certify the class.

On April 7, the district court entered a 14-day TRO, based largely on the CDC's guidance for correctional facilities. *See* Ctrs. for Disease Control & Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (March 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf [hereinafter CDC Guidance]. The guidance provided suggestions regarding cleaning, hygiene, and disease-prevention practices, and also recommended that detention facilities "[i]mplement social distancing strategies to increase the physical space between incarcerated/detained persons (ideally 6 feet between all individuals, regardless of the presence of symptoms)." *Id.* at 9–11 (emphasis omitted). Among other precautions, the district court's TRO required the defendants to provide for six-foot spacing between inmates "[t]o the maximum extent possible" and to ensure that each inmate received soap and cleaning

supplies. The TRO further ordered the defendants to file a notice describing the measures that Metro West had employed and identifying medically vulnerable individuals.

The defendants' notice of compliance, filed two days later, advised the district court that they had, among other things:

- provided inmates access to cleaning supplies;
- provided personal hygiene supplies, including liquid soap and paper towels;
- acquired "industrial grade fogging type sanitization equipment to sanitize housing units when inmates are in recreation (three times per week)";
- issued masks to all inmates and employees;
- cancelled inmate visitation;
- implemented mandatory wellness screenings for all staff;
- formalized a "new intake quarantine protocol";
- made efforts "to successfully decrease overall inmate population and allow for increased social distancing";
- increased awareness about social distancing and instructed staff "to continually walk throughout [Metro West] to enforce social distancing by officers and inmates";
- modified the "sick call process" in order "to allow for an expedited review" of inmates with COVID-19 symptoms;
- posted notices "in English, Creole and Spanish that encourage social distancing and proper hygiene" and provided other information about the virus; and
- instituted a "COVID-19 Incident Command Center and a Response Line" for tracking the virus' impact on inmates and staff.

The defendants' notice indicated that they had taken many of these measures even before the plaintiffs had filed suit.

On April 14, the district court extended the TRO and commissioned two independent experts to inspect Metro West, evaluate the defendants' compliance

6

with the TRO, and submit a report with their findings.  The experts' report—which was filed seven days later—explained that Metro West's administrators and employees were "doing their best balancing social distancing and regulation applicable to the facility" and that they "should be commended for their commitment to protect the staff and the inmates."  Expert Report at 2.  In particular, the report observed that Metro West was conducting staff screenings, that the facility appeared clean, that cleaning supplies were available, that inmates and staff had masks, and that inmates were "staggered and appropriately distanced when going to medical."  *Id.* at 2–3.  The report also stated, however, that while "[t]he bunks are staggered with head to foot configuration," there wasn't six feet between them, that inmates congregated around tables and televisions, that "[t]he areas with the telephones do not allow for social distancing," and that most of the units "were too overcrowded to allow for adequate social distancing."  *Id.* at 2. The report recommended testing, increased screening of inmates, and "an urgent decrease in the population density" because "the high census of Metro West . . . in addition to the dormitory style housing units, makes it impossible to follow CDC guidance for social distancing measures."  *Id.* at 3.

## B

In the run-up to the preliminary-injunction hearing, both parties submitted additional evidence.  For their part, the defendants notified the court that they had

purchased and installed ionizers to purify the air and body-heat cameras to measure inmates' temperatures, and had begun testing even asymptomatic inmates. The defendants also explained that through their collaboration with state criminal-justice officials, nearly 900 inmates had been released—reducing Metro West's population to less than 70% of its capacity—and that they would continue working to reduce the inmate population. The defendants further stated that "[v]irtually all of the measures taken after [the lawsuit was filed] would have been taken, regardless of the allegations made in th[e] case" and that "[t]he only aspect of the TRO that had not been in place prior to its entry was the Court-ordered use of paper towels and liquid soap"—which, the defendants had earlier clarified, had been supplied to all housing units by the time they filed their notice of compliance on April 9. The defendants also represented that they would continue to take necessary precautions "even in the absence of a court order."

The plaintiffs' additional inmate declarations acknowledged some improvements in Metro West's conditions—for instance, they noted that jail staff had put tape on the floor in certain areas to encourage social distancing, made intercom announcements to remind inmates to practice social distancing and to wash their hands, checked inmates' temperatures twice a day, and ensured that units contained liquid soap and paper towels. Still, though, the inmates continued to stress what they perceived to be a lack of adequate distancing. They stated that

it was difficult or impossible to distance from other inmates in certain spaces or during certain times of the day—*e.g.*, while using the bathrooms, showers, and telephones, when queuing to receive medication or go to the clinic, while in line to receive food at mealtime and while eating, during pre-recreation pat-downs, and during thrice-daily head counts, when inmates stand shoulder-to-shoulder with their bunkmates and only two to three feet apart from others. Some of the inmate declarations also indicated that the social-distancing measures that Metro West had promulgated weren't being uniformly enforced. For example, one stated that while jail administrators had placed tape on the floor to indicate where inmates should stand while in line to receive medication, "mostly people still line up very close together." For additional support, the plaintiffs presented declarations from four medical experts, who opined that social distancing and further population reductions were necessary.

On April 29, after holding a two-day hearing, the district court issued a preliminary injunction on the plaintiffs' § 1983 claim. (The court separately denied the plaintiffs relief on their § 2241 petition, and thus refused to order the release of any inmates. That decision isn't before us.) The court noted that "[i]t is clear that there remain several factual disputes regarding the extent to which Defendants' stated policies to protect inmates and staff from COVID-19 are being implemented and enforced." Dist. Ct. Order at 33–34. But it emphasized that it

was "unrebutted" that "the rate of inmate infections has increased dramatically" and that undisputed "medical evidence and testimony from numerous doctors" showed "that other measures—absent social distancing—are not alone sufficient to stop the spread of the virus." *Id.* at 34. "Thus," the court held, "even if [it] were to credit all of Defendants' evidence at this stage and discount the factual disputes about the implementation of Defendants' policies and procedures, Plaintiffs have nonetheless made a clear showing as to each of the four factors required for injunctive relief on their Eighth Amendment claim." *Id.* at 35. The court reasoned that "[b]ecause [the plaintiffs] have demonstrated that the lack of social distancing—which has not been and cannot be achieved absent an additional reduction in Metro West's population or some other measure to achieve meaningful social distancing—and the issues attendant to effectively implementing CDC standards present an immediate, ongoing risk of harm to Plaintiffs, they have met their burden." *Id.*

When considering the plaintiffs' likelihood of success on their constitutional claim, in particular, the district court said much the same thing. Specifically, it held that "even considering the measures Defendants have adopted—and setting aside the numerous factual disputes as to the consistency and efficacy of those measures—the record nonetheless can be seen to demonstrate deliberate indifference to a serious risk of harm to Plaintiffs." *Id.* at 37. First, the court stated

10

that the "Defendants' contention that the actions they have taken to date are

sufficient is belied by the exponential rate of infection since this case

commenced"—emphasizing that whereas no inmates had tested positive at the time

the complaint was filed, 163 inmates had tested positive within the ensuing three

weeks. *Id.* Second, the court explained that "the evidence adduced in the case

shows that inmates at Metro West are not able to achieve meaningful social

distancing, and that the experts agree social distancing is a critical step in

preventing or flattening the rate of contagion." *Id.* For support, the court

referenced inmate declarations "indicat[ing] that social distancing is either not

possible . . . or is not uniformly enforced." *Id.* at 37–38. The court then

concluded: "Thus, Plaintiffs have met both the subjective and objective

components of the Eighth Amendment's deliberate indifference analysis." *Id.* at

38.

The district court held that the remaining preliminary-injunction factors

favored relief, as well. It concluded—albeit in a single sentence—that the

plaintiffs would suffer irreparable injury absent immediate relief because of the

danger posed by the virus' spread. *Id.* at 41. The balance of the harms also

weighed in the plaintiffs' favor, the court reasoned, because the defendants hadn't

shown that the administrative burden of the injunction overcame the threat posed

by the virus: Because the defendants "repeatedly stated they were poised to take

11

the measures in the TRO before its entry and have now implemented those

measures and more," the court explained that the injunction would result in "no

appreciable impact on them." *Id.* at 43.  Finally, the court held that injunctive

relief would advance the public interest by reducing the possibility of community

spread.  *Id.*

      The district court's injunction required the defendants to take numerous

actions—many of which the court had already ordered in the TRO—including that

the defendants, "[t]o the maximum extent possible considering [Metro West's]

current population level, provide and enforce adequate spacing of six feet or more

between people incarcerated at Metro West so that social distancing can be

accomplished." *Id.* at 49–50.  It also directed the defendants, among other things,

to communicate with inmates about COVID-19 and to ensure that all inmates have

access to testing, protective masks, cleaning and hygiene supplies, and adequate

medical care.  *Id.* at 49–51.  The injunction imposed reporting requirements, as

well, ordering the defendants to:

- file a notice with the court every three days detailing the number of staff and inmates quarantined or infected, and "continue to provide this information to their state criminal justice partners";
- file a weekly report with the current population of Metro West; and
- submit a proposal within seven days describing the steps that the defendants "will undertake to ensure additional social distancing safeguards in terms of housing inmates and inmate activity (medical visits, telephones, etc.)."

*Id.* at 51–52.

The defendants immediately appealed the preliminary injunction and requested a stay, which we granted in a published order. *Swain v. Junior*, 958 F.3d 1081, 1092 (11th Cir. 2020). This is our review on the merits.

## II

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). In order to obtain one, a party must establish four separate requirements—namely, that "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Jones v. Governor of Fla.*, 950 F.3d 795, 806 (11th Cir. 2020) (quotation omitted). We will consider each factor, although we will focus our attention where the district court did—on the likelihood that the plaintiffs will succeed on the merits of their constitutional claim.[3]

## A

The plaintiffs contend that the defendants have been "deliberately indifferent" to the serious risk that COVID-19 poses to them, in violation of the

---

[3] "We review a district court's grant of preliminary injunctive relief for abuse of discretion." *Jones v. Governor of Fla.*, 950 F.3d at 806. The court's underlying legal conclusions are reviewed de novo, and its factual findings are reviewed for clear error. *Id.*

Fourteenth Amendment to the U.S. Constitution.  Although the plaintiffs' claim

technically arises under the Fourteenth Amendment because they are pretrial

detainees rather than convicted prisoners, it is "evaluated under the same standard

as a prisoner's claim of inadequate care under the Eighth Amendment." *Dang ex*

*rel. Dang v. Sheriff, Seminole Cty. Fla.*, 871 F.3d 1272, 1279 (11th Cir. 2017).

The Eighth Amendment—and therefore the Fourteenth also—is violated when a

jailer "is deliberately indifferent to a substantial risk of serious harm to an inmate

who suffers injury." *Lane v. Philbin*, 835 F.3d 1302, 1307 (11th Cir. 2016).

To establish a deliberate-indifference claim, a plaintiff must make both an

objective and a subjective showing.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

Under the objective component, the plaintiff must demonstrate "a substantial risk

of serious harm."  *Id.*  Here, the defendants seem to agree—wisely, we think—that

the risk of COVID-19 satisfies this requirement.  Under the subjective component,

the plaintiff must prove "the defendants' deliberate indifference" to that risk of

harm by making three sub-showings: "(1) subjective knowledge of a risk of serious

harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence."

*Lane*, 835 F.3d at 1308 (quotation omitted).[4]  Helpfully, the defendants seem not to

---

[4] The Supreme Court's decision in *Kingsley v. Hendrickson*, which held that pretrial detainees
alleging excessive force need only show objective unreasonableness, doesn't change our analysis
here.  135 S. Ct. 2466, 2470 (2015).  This case doesn't arise in the excessive-force context, and
we have otherwise continued to require detainees to prove subjective deliberate indifference.  *See*
*Taylor v. Hughes*, 920 F.3d 729, 733 (11th Cir. 2019) (explaining that a plaintiff suing on behalf
of a deceased pretrial detainee had to prove deliberate indifference to the detainee's serious

dispute that they had "subjective knowledge" of the risk that the virus poses.  The inquiry here thus hinges on whether the defendants "disregard[ed]" the risk "by conduct that is more than mere negligence," *id.* (quotation omitted)—or more simply stated, whether they "recklessly disregard[ed] that risk," *Farmer*, 511 U.S. at 836.

As applied in the prison context, the deliberate-indifference standard sets an appropriately high bar.  A plaintiff must prove that the defendant acted with "a sufficiently culpable state of mind."  *Id.* at 834 (quotation omitted).  Ordinary malpractice or simple negligence won't do; instead, the plaintiff must show "subjective recklessness as used in the criminal law."  *Id.* at 839–40.  Indeed, even where "prison officials . . . actually knew of a substantial risk to inmate health or safety," they may nonetheless "be found free from liability if they responded reasonably to the risk"—and, importantly for present purposes, "even if the harm ultimately was not averted."  *Id.* at 844.  This is so because "[a] prison official's duty under the Eighth Amendment is to ensure reasonable safety, a standard that incorporates due regard for prison officials' unenviable task of keeping dangerous men in safe custody under humane conditions."  *Id.* at 844–45 (quotations and

---

medical need); *see also Dang*, 871 F.3d at 1279 n.2 (stating that *Kingsley* didn't abrogate our standard for considering claims of constitutionally deficient medical care brought by pretrial detainees because *Kingsley* "involved an excessive-force claim, not a claim of inadequate medical treatment due to deliberate indifference").

internal citations omitted); *see also Marbury v. Warden*, 936 F.3d 1227, 1233 (11th Cir. 2019) ("It is well settled that prison officials must take reasonable measures to guarantee the safety of the inmates . . . ." (quotation omitted)).

The district court here held that the plaintiffs were likely to succeed on the merits of their Eighth Amendment claim. In reviewing that determination, we consider two questions. First, and principally, we must evaluate whether the district court erred in concluding that the defendants acted with deliberate indifference. Second, and separately, we must assess whether the district court erred in refusing to address either the heightened standards for municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), or the defendants' contention that the plaintiffs failed to properly exhaust available administrative remedies under the Prison Litigation Reform Act.

**1**

**a**

Any fair reading of the district court's order demonstrates that it relied overwhelmingly—if not exclusively—on two considerations in concluding that the defendants acted with the required deliberate indifference: (1) the fact that COVID-19 was continuing to spread at Metro West and (2) the impossibility of achieving adequate social distancing.

The order's plain language tells the story. As an initial matter, when

assessing whether the plaintiffs had met the four requirements to obtain injunctive relief, the district court acknowledged "that there remain several factual disputes regarding the extent to which Defendants' stated policies . . . are being implemented and enforced," but it insisted that two things were undeniable: (1) that "the rate of inmate infections [at Metro West] ha[d] increased dramatically" and (2) that "other measures—absent distancing—are not alone sufficient to stop the spread of the virus."  Dist. Ct. Order at 33–34.  The court then held: "*Thus*, even if the Court were to credit all of Defendants' evidence at this stage and discount the factual disputes about the implementation of Defendants' policies and procedures, Plaintiffs have nonetheless made a clear showing as to each of the four factors required for injunctive relief on their Eighth Amendment claim."  *Id.* at 35 (emphasis added).

The district court made the basis of its decision even clearer when analyzing deliberate indifference specifically.  There, the court again bracketed any factual disputes and yet still concluded the defendants had acted with deliberate indifference, holding that "even considering the measures Defendants have adopted—and setting aside the numerous factual disputes as to the consistency and efficacy of those measures—the record nonetheless can be seen to demonstrate deliberate indifference to a serious risk of harm to Plaintiffs."  *Id.* at 37.  For support, the district court said two things in particular.  First, it concluded that the

"Defendants' contention that the actions they have taken to date are sufficient is belied by the exponential rate of infection since this case commenced." *Id.* Second, it explained that the evidence "show[ed] that inmates at Metro West are not able to achieve meaningful social distancing," noting specifically that the inmates' declarations asserted "that social distancing is either not possible . . . or is not uniformly enforced." *Id.* at 37–38. From those two premises, the court concluded: "*Thus*, Plaintiffs have met both the subjective and objective components of the Eighth Amendment's deliberate indifference analysis." *Id.* at 38 (emphasis added).

Accordingly, even while the district court seemed to assume a state of affairs in which the defendants had taken numerous measures to combat the virus, it held that the defendants were nonetheless deliberately indifferent based on two considerations: (1) the increase in the rate of infections at Metro West and (2) the lack—and seeming impossibility—of meaningful social distancing at the facility. In so concluding, the district court erred. Neither the resultant harm of increasing infections nor the impossibility of achieving six-foot social distancing in a jail environment establishes that the defendants acted with "subjective recklessness as used in the criminal law." *Farmer*, 511 U.S. at 839–40 (quotation omitted).

First, and most obviously, the district court erred in relying on the increased rate of infection. On this point, the Supreme Court's decision in *Farmer* couldn't

be any clearer: "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, *even if the harm ultimately was not averted*." *Id.* at 844 (emphasis added). A resulting harm thus cannot alone establish a culpable state of mind. *Cf. Wilson v. Seiter*, 501 U.S. 294, 303 (1991) (stating that "the 'wantonness' of conduct" doesn't "depend[] upon its effect upon the prisoner"); *Wilson v. Williams*, No. 20-3447, 2020 WL 3056217, at *10 (6th Cir. June 9, 2020) (rejecting the contention that "the [Bureau of Prisons] was deliberately indifferent to petitioners' health and safety because [its] actions have been ineffective at preventing the spread of COVID-19").

Second, and separately, the district court erred in concluding that the defendants' inability to ensure adequate social distancing constituted deliberate indifference. The court stated no less than eight times in its order that adequate social distancing was "not possible" or "impossible." *See, e.g.*, Dist. Ct. Order at 7, 11, 12, 13, 16, 38. (The plaintiffs acknowledge the same at least six times in their brief. *See, e.g.*, Br. of Appellees at 4, 8, 12, 15, 19, 54.) The court-commissioned expert report likewise observed that Metro West's population made it "impossible to follow CDC guidance for social distancing measures." Expert Report at 3. And indeed, the district court noted that the inmates' own declarations supported the conclusion that social distancing "is impossible to achieve given the

19

current population at Metro West."  Dist. Ct. Order at 12.  Failing to do the

"impossible" doesn't evince indifference, let alone deliberate indifference.

### b

So much for what the district court said.  Now for what it didn't say.  As

already explained, the fundamental question in any deliberate-indifference case is

whether the defendants exhibited "a sufficiently culpable state of mind."  *Farmer*,

511 U.S. at 834 (quotation omitted).  In evaluating that question, we must focus

not on isolated failures—or impossibilities, as the case may be—but rather on the

defendants' entire course of conduct.  And in assessing that course of conduct here,

we must take the case as the district court left it—*i.e.*, as one in which we "credit

all of Defendants' evidence," "discount the factual disputes about the

implementation of Defendants' policies and procedures," and "set[] aside the

numerous factual disputes" about the various measures that the defendants claim to

have adopted.  Dist. Ct. Order at 35, 37.  So framed, it seems to us quite unlikely

that the plaintiffs can succeed on the merits of their constitutional claim.

It bears repeating that deliberate indifference is *not* a constitutionalized

version of common-law negligence.  To the contrary, we (echoing the Supreme

Court) have been at pains to emphasize that "the deliberate indifference

standard . . . is far more onerous than normal tort-based standards of conduct

sounding in negligence," *Goodman v. Kimbrough*, 718 F.3d 1325, 1332 (11th Cir.

2013), and is in fact akin to "subjective recklessness as used in the criminal law," *Farmer*, 511 U.S. at 839–40; *see also id.* at 835 ("[D]eliberate indifference describes a state of mind more blameworthy than negligence."). Were we to accept the district court's determination that resulting harm, the failure to take impossible measures, or even the combination of both suffices to show a criminally (and thus constitutionally) reckless mental state, "the deliberate indifference standard would be silently metamorphosed into a font of tort law—a brand of negligence redux—which the Supreme Court has made abundantly clear it is not." *Goodman*, 718 F.3d at 1334.

It is undisputed, as the district court said, that the defendants didn't succeed in preventing the virus' spread. It is also undisputed that they didn't do the "impossible" by ensuring six-foot social distancing. But what *did* the defendants do? And can we say that their response was reckless? First, with respect to social distancing in particular, as the court-commissioned expert report summarized, the defendants "d[id] their best." Expert Report at 2. In particular, the report observed that the defendants put "tape on the floor to encourage social distancing in lines," that "bunks are staggered with head to foot configuration" in order to maximize the distance between faces during sleep, and that "[p]atients are staggered and appropriately distanced when going to medical." *Id.* Importantly, we think, while the report noted some social-distancing violations, it concluded that Metro West's

21

administrators and employees were "doing their best balancing social distancing and regulation applicable to the facility," and that they "should be commended for their commitment to protect the staff and the inmates." *Id.* It's worth noting, though not determinative, that the CDC's guidance—on which the district court relied heavily—presupposes that some modification of its social-distancing recommendations will be necessary in institutional settings. The guidance states in bold-face type, on the very first page, that it "may need to be adapted based on individual facilities' physical space, staffing, population, operations, and other resources and conditions." CDC Guidance at 1. Regarding social distancing specifically, it says that while there should "ideally" be six feet between inmates, "[s]trategies will need to be tailored to the individual space in the facility and the needs of the population and staff," and that "[n]ot all strategies will be feasible in all facilities." *Id.* at 11. It therefore offers "strategies with varying levels of intensity," such as—importantly here, because the defendants claimed to have done so—"[a]rrang[ing] bunks so that individuals sleep head to foot to increase the distance between them." *Id.*

Moreover, the defendants have represented that they took numerous *other* measures—besides social distancing—to mitigate the spread of the virus. The district court summarized a few of them:

- "requiring staff and inmates to wear face masks at all times (other than when sleeping)";

22

- "conducting screening for all staff entering the facility";
- "conducting daily temperature screenings for all inmates";
- "suspending all outside visitation"; and
- "providing disinfecting and hygiene supplies to all inmates."

Dist. Ct. Order at 20. And as already explained, before the preliminary injunction was entered, the defendants notified the district court that they had purchased and installed ionizers to clean the facility's air and body-heat cameras to measure inmates' temperatures, and had even begun testing asymptomatic detainees for the virus as resources became more widely available. Remember, the district court made no findings that these measures hadn't been implemented. Quite the opposite, in fact: The court assumed, for the sake of its deliberate-indifference analysis, at least, that the defendants *had* implemented these measures, but nonetheless concluded, as a matter of law, that they must have been inadequate because (1) the rate of infections rose and (2) social distancing—which it took to be the most critical measure—wasn't possible.[5]

---

[5] This marks a fundamental methodological disagreement with the dissent. We take the district court at its word that it assumed for purposes of its decision that the defendants *had* implemented numerous precautionary measures but nonetheless held that the defendants were deliberately indifferent. The dissent, by contrast—and we think incorrectly—takes the plaintiffs' allegations as true and evaluates the case "[o]n th[e] record" as detailed therein. Dissenting Op. at 36; *see also id.* ("Plaintiffs also submitted nearly two dozen sworn affidavits describing . . . ."); *id.* at 38 ("My review of this record . . . ."); *id.* at 47 ("[T]he statements of the people detained at Metro West . . . paint a far different picture."); *id.* at 48 ("Detainees say . . . ."); *id.* at 49 ("The detainee declarations also suggest . . . ."); *id.* at 50 ("In light of the plaintiffs' evidence here . . . ."); *id.* (referring to "the practices attested to in the detainee declarations" and "the actual conditions described by detainees").

23

Whatever deliberate indifference is, the defendants' conduct here doesn't show it. The district court erred in holding that the defendants acted with a deliberately indifferent mental state, equivalent to "subjective recklessness as used in the criminal law." *Farmer*, 511 U.S. at 839–40. We simply cannot conclude that, when faced with a perfect storm of a contagious virus and the space constraints inherent in a correctional facility, the defendants here acted unreasonably by "doing their best." Because the defendants "act[ed] reasonably," they "cannot be found liable" under the Eighth Amendment. *See id.* at 845; *see also Williams*, 2020 WL 3056217, at *7.

\* \* \*

We pause briefly to address two arguments that the plaintiffs have raised on appeal. They contend that whatever the district court's order *said*, its deliberate-indifference conclusion was *actually* premised on (1) the defendants' failure to implement what the plaintiffs call "feasible" social-distancing measures and (2) Junior's continued enforcement of pretrial-detention orders despite the fact that Metro West's current population precludes adequate distancing. For reasons already explained, we don't think the district court's order says either of those things. And even if it did, our conclusion would remain unchanged.

First, "feasible" distancing. The plaintiffs assert that the district court determined that the defendants—despite knowing that social distancing is critically

24

important—were deliberately indifferent because they "neither adopted nor implemented *feasible* social-distancing measures."  Br. of Appellees at 27 (emphasis added).  But the portion of the district court's analysis that the plaintiffs cite doesn't say that at all; indeed, although the plaintiffs refer to "feasible" social distancing some 14 times in their brief, *see, e.g.*, *id.* at 3, 4, 10, 16, 19, 26, 27, 28, 29, 31, 41, 54, the district court didn't mention "feasible" social distancing even once.

At most, it seems to us, the district court's order can be read to hold that social distancing was "not uniformly enforced" in certain instances, "such as when inmates line up to receive food and eat together in their unit; when inmates line up for headcount; when inmates line up outside the clinic to receive medication; and when inmates participate in mandatory outdoor recreation once a week."  Dist. Ct. Order at 38.  But again, assuming the same state of affairs that the district court did—one in which we "discount the factual disputes about the implementation of Defendants' policies and procedures"—the allegedly nonuniform enforcement of social distancing cannot alone constitute deliberate indifference.  The district court *never* found that the defendants knew of any potential lapses in enforcement and deliberately ignored them.[6]  As we have explained, while the expert report noted

---

[6] Defendant Junior's declaration stated that he was "not aware" of any lapses in the enforcement of Metro West's policies, that he had deployed an "internal auditing team to ensure compliance

some distancing violations, it also observed that social-distancing measures had been implemented and that Metro West's staff members were "doing their best."

Second, ongoing confinement.  The plaintiffs assert that "[t]he district court separately found that plaintiffs will likely establish that Junior has exhibited deliberate indifference by enforcing plaintiffs' ongoing confinement when the jail's population precludes adequate distancing."  Br. of Appellees at 34.  But again, that's just not what the district court's order says.  To the contrary, in fact, the district court recognized state criminal-justice officials' role—separate from Junior's—in determining which inmates would be released; in its injunction order, the court ordered the defendants to provide "their state criminal justice partners" with updated information about the virus, presumably so that the defendants, in coordination with state-level actors, could reduce Metro West's population.  Dist. Ct. Order at 51–52.

Even if the plaintiffs' posited determination existed, we would reject their reliance on it.  Assuming for present purposes (only) that "failing to take an action one knows to be necessary to prevent serious harm—even if outside one's legal authority—can establish the requisite intent for deliberate indifference," Br. of

---

throughout the facility," and that the defendants would "take appropriate corrective action" if procedures were violated.

Appellees at 35, that intent hasn't been shown here.[7]  By taking other measures, besides release—including, among many other things, implementing some social-distancing measures, distributing face masks, screening inmates and staff, and providing cleaning and personal hygiene supplies—Junior has responded reasonably to the risk of the virus.  Moreover, Junior has been working toward *exactly* what the plaintiffs seek: a reduction in Metro West's population.  Indeed, by the time the district court entered its injunction, Junior and state criminal-justice officials had together secured the release of 894 inmates, thereby reducing Metro West's population to less than 70% capacity.[8]

---

[7] While we needn't decide it now, legal authority must have *some* bearing on this question.  We have suggested—albeit in dicta—that resource limitations alone preclude deliberate-indifference liability.  *See, e.g.*, *Harris v. Thigpen*, 941 F.2d 1495, 1509 (11th Cir. 1991) (stating that "a lack of funds allocated to prisons by the state legislature . . . will not excuse the failure of correctional systems to maintain a certain minimum level of medical service necessary to avoid the imposition of cruel and unusual punishment").  And some of our precedent suggests that "an allegedly contrary duty at state law" won't "excuse the perpetuation of unconstitutional conditions of confinement."  *Smith v. Sullivan*, 611 F.2d 1039, 1043–44 (5th Cir. 1980).  But it certainly isn't the law that *any* person with physical capacity to provide relief to an inmate—say, a custodian at Metro West—can be deemed deliberately indifferent for failing to do so.

[8] The plaintiffs' reliance on *Ex parte Young*, 209 U.S. 123 (1908), is misplaced.  They contend that their suit can be understood as an action against Junior "as enforcer of state-court detention orders, under the well-established doctrine of *Ex parte Young*."  Br. of Appellees at 37.  Even if we were to assume that Junior is a proper defendant under *Ex parte Young*, that does no more than tell us that a suit could lie against him for "prospective equitable relief to end continuing violations of federal law."  *Fla. Ass'n of Rehab. Facilities, Inc. v. State of Fla. Dep't of Health & Rehab. Servs.*, 225 F.3d 1208, 1219 (11th Cir. 2000); *see also McNeil v. Cmty. Prob. Servs., LLC*, 945 F.3d 991, 992–93 (6th Cir. 2019) (upholding an injunction prohibiting a sheriff from detaining probation violators under possibly unconstitutional bail requirements); *Moore v. Urquhart*, 899 F.3d 1094, 1103 (9th Cir. 2018) (holding that injunctive relief could be sought against a sheriff due to his enforcement of an allegedly unconstitutional eviction procedure).  Just because Junior could be *ordered to* take an action on pain of contempt doesn't mean that failing to take such an action necessarily constitutes deliberate indifference.  And for all the

**2**

Shifting gears, the defendants separately contend that the district court erred in its likelihood-of-success-on-the-merits analysis because it failed to consider "two threshold issues": (1) the heightened standard for municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and (2) PLRA exhaustion.  We agree.

Regarding municipal liability, the district court reasoned that "[a]t the preliminary injunction stage . . . Plaintiffs are not required to 'prove a custom' or 'identify a final policymaker,'" Dist. Ct. Order at 32, as would normally be required under *Monell*, *see* 436 U.S. at 690–91.  That is incorrect.  The Supreme Court has recently reiterated that "[i]t is well established that in a § 1983 case a city or other local governmental entity cannot be subject to liability *at all* unless the harm was caused in the implementation of 'official municipal policy.'" *Lozman v. City of Riviera Beach*, 138 S. Ct. 1945, 1951 (2018) (emphasis added) (quoting *Monell*, 436 U.S. at 691).  Municipal liability is thus plainly part of the likelihood-of-success-on-the-merits inquiry at the preliminary-injunction stage, and the district court erred in sidestepping the issue.  *See Church v. City of Huntsville*, 30 F.3d 1332, 1347 (11th Cir. 1994) (holding that "the plaintiffs have failed to

reasons explained in text, we reject the contention that the defendants have been deliberately indifferent.

establish the existence of a municipal policy or a pervasive practice that could

serve as a predicate to municipal liability under section 1983" and that "[t]herefore,

they have not shown a substantial likelihood of success on the merits").

The district court also erred in refusing to consider the defendants'

arguments with respect to PLRA exhaustion.[9]  "There is no question that

exhaustion is mandatory under the PLRA and that unexhausted claims *cannot be*

*brought* in court."  *Jones v. Bock*, 549 U.S. 199, 211 (2007) (emphasis added); *see*

*also Chandler v. Crosby*, 379 F.3d 1278, 1286 (11th Cir. 2004) ("A district court

must dismiss the suit when it finds that the plaintiff-inmate has not exhausted his

administrative remedies.").  Accordingly, the plaintiffs could show a substantial

likelihood of success on the merits only if the defendants were unlikely to

demonstrate a lack of PLRA exhaustion.  *See Gonzales v. O Centro Espirita*

*Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006) (explaining that "the

burdens at the preliminary injunction stage track the burdens at trial").

**B**

While the failure to show likelihood of success on the merits alone warrants

reversal, we briefly address the district court's analysis of the remaining

---

[9] We reject the plaintiffs' argument that the district court declined to consider PLRA exhaustion because the defendants had waived it.  The district court alluded to waiver in a footnote, but clearly explained that exhaustion would "be fully considered" as part of the defendants' motion to dismiss at a later time, noting simply that it didn't think exhaustion was an appropriate "issue to be decided at the preliminary injunction stage."  Dist. Ct. Order at 28.

preliminary-injunction factors—irreparable harm, the balancing of the harms, and the public interest. *Jones v. Governor of Fla.*, 950 F.3d at 806.

First, the district court erred in holding, without any meaningful analysis, that the plaintiffs would suffer irreparable injury absent an injunction on the ground that "COVID-19 will continue to spread throughout Metro West and infect additional inmates and staff." Dist. Ct. Order at 41. We agree with the defendants that the inquiry isn't whether the plaintiffs have shown that the virus poses a danger to the inmates in the abstract—it undoubtedly does—but rather whether they have shown that they will suffer irreparable injury "unless the injunction issues." *Jones v. Governor of Fla.*, 950 F.3d at 806.

Although the district court acknowledged that our precedent calls the irreparable-injury element "the *sine qua non* of injunctive relief," it devoted only a single conclusory sentence to addressing that requirement—and it gave no consideration to whether the plaintiffs were likely to suffer irreparable injury *absent an injunction*. Dist. Ct. Order at 41. To be sure, the court asserted that without injunctive relief, the virus would continue to spread. But given the way it decided the case, the court couldn't properly determine whether the plaintiffs would be injured absent injunctive relief because it declined to make factual findings about the extent and efficacy of the measures that the defendants were already taking. "As we have emphasized on many occasions, the asserted

30

irreparable injury must be neither remote nor speculative, but actual and imminent." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (quotation omitted); *see also Winter*, 555 U.S. at 22 ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.").  Although the district court suggested that there were "factual disputes" regarding the degree to which the defendants were implementing protective measures, it opted not to resolve them. While the court didn't have to accept the defendants' representations that they would continue to take measures to safeguard inmates from COVID-19, it clearly had to reject those measures as insufficient before deciding that *only* a mandatory injunction could prevent the plaintiffs from suffering irreparable harm.

Second, the district court erred in its determination of the balance-of-the-harms and public-interest factors, which "merge" when, as here, "the Government is the opposing party." *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (noting as much in the stay context).  The district court held that "[t]he threat of a continuing outbreak of COVID-19" outweighed "the damage to Defendants caused by an injunction requiring Defendants to comply with the CDC Guidance" because, the court said, the defendants had "not offered any evidence as to why the administrative burden resulting from compliance with an injunctive order

31

outweighs the threat of serious illness or death" that would result from the virus. Dist. Ct. Order at 42–43. With regard to the public interest, it held that "an order requiring Defendants to implement various measures to reduce the spread of the virus in Metro West advances the public interest by reducing the chance of community spread." *Id.* at 43.

While the virus unquestionably poses a serious threat to inmates, the district court gave insufficient consideration to the burdens with which the injunction would saddle the defendants. *Cf. Williams*, 2020 WL 3056217, at *11 (noting that the district court's preliminary-injunction analysis was "incomplete" because "the district court gave scant attention to the harms the BOP argued would result from the injunction"). And to be clear, this is not (solely) about weighing health and safety against security and administrative efficiency; it is also about weighing health and safety against health and safety. As this Court explained in its stay order, the injunction stripped away at least some of the defendants' discretion "to allocate scarce resources among different county operations necessary to fight the pandemic." *Swain*, 958 F.3d at 1090. For example, because "the injunction require[d] that the defendants test all inmates with COVID-19 symptoms and everyone with whom they have been in contact," it forced the defendants to "allocate limited testing resources to Metro West at the expense of other county facilities," under pain of contempt. *Id.* Perhaps especially in the prison context,

32

government officials have a keen interest in maintaining the necessary flexibility to react quickly in response to new information about the virus.  The district court therefore erred in failing to consider the "damage [its] proposed injunction may cause" the defendants.  *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1247 (11th Cir. 2016) (quotation omitted).

Finally, while it doubtlessly advances the public interest to stem the spread of COVID-19, at Metro West and everywhere, the same public interest just as doubtlessly favors a proper allocation of public-health resources—an allocation that politically accountable (and often local) officials are best equipped to make. *See S. Bay United Pentecostal Church v. Newsom*, No. 19A1044, 2020 WL 2813056 (U.S. May 29, 2020) (Roberts, C.J., concurring in denial of application for injunctive relief) ("Our Constitution principally entrusts '[t]he safety and the health of the people' to the politically accountable officials of the States 'to guard and protect.'" (quoting *Jacobson v. Massachusetts*, 197 U.S. 11, 38 (1905)).[10]

---

[10] Because we conclude that the district court erred in granting the preliminary injunction, we needn't address whether the terms of the injunction violated the PLRA and Federal Rule of Civil Procedure 65.  We pause to note, however, that the district court's formulaic recitation at the end of its order—that "the relief set forth herein is 'narrowly drawn, extends no further than necessary to correct the violation of' Plaintiffs' Eighth Amendment rights, 'and is the least intrusive means necessary to correct' Defendants' violation of those rights," Dist. Ct. Order at 48–49—may well be insufficient to meet this Court's reading of PLRA § 3626(a)(1) "to require particularized findings that each requirement imposed by the preliminary injunction satisfies each of the need-narrowness-intrusiveness criteria," *United States v. Sec'y, Fla. Dep't of Corr.*, 778 F.3d 1223, 1228 (11th Cir. 2015) ("We see no reason why the term 'finds' in § 3626(a)(1) does not require the same particularity as the term 'findings' in § 3626(b)(3)."); *see also Cason v. Seckinger*, 231 F.3d 777, 785 (11th Cir. 2000) (requiring particularized findings under 18

33

## III

While COVID-19 poses novel health risks to incarcerated inmates—and novel administrative challenges for jail and prison administrators—the law that the district court was bound to apply is well established. In order to obtain a preliminary injunction, the plaintiffs had to show a substantial likelihood of success on the merits of their constitutional claim, which means that they had to demonstrate the defendants' deliberate indifference—which is to say their utter recklessness. Because the district court erred, among other ways, in erroneously concluding that the plaintiffs had met that requirement, we conclude that it abused its discretion in granting the preliminary injunction.[11]

**VACATED AND REMANDED.**

---

U.S.C. § 3626(b)(3) and holding that a "district court's summary conclusion" that relief met the PLRA's requirements was "seriously deficient").

[11] There is one loose end: We recognize that, due to the evolving nature of both the COVID-19 virus and the public-health community's recommended responses to it, the district court might be faced on remand with a factual landscape that has changed since it issued its injunction. We emphasize the Supreme Court's admonition that, in a suit in which a plaintiff "seeks injunctive relief to prevent a substantial risk of serious injury from ripening into actual harm, 'the subjective factor, deliberate indifference, should be determined in light of the prison authorities' *current attitudes and conduct*': their attitudes and conduct at the time suit is brought *and persisting thereafter*." *Farmer*, 511 U.S. at 845 (emphasis added) (quoting *Helling v. McKinney*, 509 U.S. 25, 36 (1993)). Accordingly, any future assessment of the defendants' conduct must take account of additional measures and precautions that the defendants have instituted during the pendency of this appeal.

34

MARTIN, Circuit Judge, dissenting:

The COVID-19 pandemic is a health crisis without precedent in living memory. At the time we heard oral argument in this case, the virus had already claimed the lives of over 100,000 Americans. Ctrs. for Disease Control & Prevention, United States Coronavirus (COVID-19) Death Toll Surpasses 100,000 (May 28, 2020), https://www.cdc.gov/media/releases/2020/s0528-coronavirus-death-toll.html. COVID-19 is highly infectious and easily communicable. Of those infected, approximately 20% will become seriously ill and 1 to 3% will die. People with common health conditions including lung or heart disease, diabetes, and chronic liver or kidney conditions are at much greater risk of death. About 15% of them will die if they contract COVID-19. Those who survive may nonetheless experience permanent organ and neurological damage. There is no known vaccine or effective antiviral medication to prevent or treat infection from COVID-19. The only effective way to protect people is to take precautionary measures to avoid infection.

Against this background, seven pretrial detainees held at the Miami-Dade Metro West Detention Center ("Metro West") brought suit against Daniel Junior, the director of the Miami-Dade Corrections and Rehabilitation Department ("MDCR"), and Miami-Dade County. They sued on behalf of a putative class of people detained at Metro West during the COVID-19 pandemic, as well as a subset

35

of people in pretrial custody at Metro West who are particularly vulnerable to injury or death if they contract the virus. The named plaintiffs all have preexisting medical conditions that place them among those at highest risk of death or serious illness if they are infected. They sought emergency declaratory and injunctive relief that would compel Metro West to take steps to reduce the risk of transmission of COVID-19 at the facility.[1]

As part of their emergency request for relief, Plaintiffs presented extensive evidence showing a unified expert consensus on two essential facts. First, the best way to prevent infection is through social distancing. Second, adequate social distancing was not possible at the population level in Metro West at the time they sought the injunction. Plaintiffs also submitted nearly two dozen sworn affidavits describing how jail staff and administrators had failed to implement adequate measures to maintain safe conditions even while Metro West remains dangerously crowded. On this record, I believe Plaintiffs are likely to succeed on their deliberate indifference claim. I would therefore affirm the preliminary injunction imposed by the District Judge.

---

[1] Plaintiffs also sought a writ of habeas corpus pursuant to 28 U.S.C. § 2241 on behalf of the subset of medically vulnerable individuals. Through this request, Plaintiffs sought the immediate release of themselves and all other members of the subset. The District Court denied the petition. The denial of that petition is not now before us.

# I.

Because incarceration "strip[s] [detainees] of virtually every means of self-protection and foreclose[s] their access to outside aid," the Constitution imposes affirmative obligations on jail officials to provide prisoners with "adequate food, clothing, shelter, and medical care," and to "take reasonable measures to guarantee [their] safety."[2] Farmer v. Brennan, 511 U.S. 825, 832–33, 114 S. Ct. 1970, 1976–77 (1994) (quotation marks omitted). Jail officials violate the Eighth and Fourteenth Amendment when they fail to respond reasonably to a known, substantial risk of serious harm, such as "exposure . . . to a serious, communicable disease." See Helling v. McKinney, 509 U.S. 25, 33, 113 S. Ct. 2475, 2480 (1993); see also Marbury v. Warden, 936 F.3d 1227, 1233 (11th Cir. 2019) (per curiam) ("It is well settled that prison officials must take reasonable measures to guarantee the safety of the inmates." (quotation marks omitted)).

Plaintiffs seeking to prove this type of Fourteenth Amendment violation must show that jail officials acted with "deliberate indifference." Farmer, 511 U.S. at 840, 114 S. Ct. at 1980. Plaintiffs must show that they face a substantial risk of serious harm and that defendants were deliberately indifferent to that risk.

---

[2] While the Fourteenth Amendment governs the constitutional limits of pretrial detention conditions, our circuit treats deliberate indifference claims brought under the Fourteenth Amendment similarly to those brought on behalf of convicted prisoners under the Eighth Amendment. See Taylor v. Hughes, 920 F.3d 729, 733 (11th Cir. 2019).

Goodman, 718 F.3d at 1331.  While the first prong is objective, the second prong

has both subjective and objective components.  There must be a showing that jail

officials actually knew of the risk and either disregarded it or failed to respond in a

reasonable manner.  Marbury, 936 F.3d at 1233; see Rodriguez v. Sec'y for Dep't

of Corr., 508 F.3d 611, 620 (11th Cir. 2007).

My review of this record amply supports the District Court's holding that

Plaintiffs are likely to show their treatment amounted to deliberate indifference.

Defendants acknowledge their subjective awareness of the objectively grave risk

the COVID-19 pandemic poses to the safety of those detained at Metro West.  But

Defendants say they took reasonable steps, within the limits of their legal

authority, to ensure detainee safety in the face of the COVID-19 threat.  Unlike the

majority, I see no abuse of discretion in the District Court's finding to the contrary.

This record shows that Defendants knowingly maintained conditions that placed

detainees at an impermissibly high risk of illness and death in two ways: first, by

maintaining a dangerously high jail population; and second, by failing to

implement needed safety measures that would reduce the risk of infection in that

already unsafe population level.  I address these two independent bases for finding

deliberate indifference in turn.

A.

First there is Metro West's unsafe population density.  I view the evidence that Defendants willfully incarcerated people at a population density that they knew to be unsafe as sufficient to show deliberate indifference.  The majority opinion nonetheless concludes that Defendants cannot be found deliberately indifferent because they took other steps to decrease the risk of COVID-19 transmission and because they lack authority to release detainees without a state criminal court order.  Maj. Op. at 27 & n.7.  I reject this reasoning.

Social distancing is the most effective measure for reducing the risk of COVID-19 transmission.  But we have unrebutted expert testimony showing that adequate social distancing was not possible at Metro West's population level at the time the preliminary injunction issued.  Dr. Dushyantha Jayaweera and Dr. Hansel Tookes were appointed by the District Court to inspect and report on conditions at Metro West.  They reflected the overwhelming expert consensus when they opined that the dense population of Metro West "makes it impossible to follow CDC guidance for social distancing measures, placing staff and inmates at risk for COVID-19 infection."  Because of this impossibility, the experts recommended an "urgent decrease" in the jail's population and increased screening for COVID-19. Defendants do not dispute the importance of social distancing or that it was effectively impossible to achieve social distancing with the population levels at

39

Metro West when the injunction issued. Yet despite knowledge that the population level was unsafe, Defendants continued to detain significantly more people than Metro West can safely hold during this pandemic. As a result, people at Metro West were much more likely to contract COVID-19 than if the jail population were reduced.

Taken together, these facts make out elements of a claim of deliberate indifference. Defendants knew of the risk posed by overcrowding, knew that this risk could be most effectively abated by lowering the jail population, and yet did not take that step. This knowing failure to take necessary steps to prevent grave harm sits comfortably at the heart of what our Court considers to be deliberate indifference. See Ancata v. Prison Health Servs., Inc., 769 F.2d 700, 704 (11th Cir. 1985) (holding that "if necessary medical treatment has been delayed for non-medical reasons, a case of deliberate indifference has been made out"). In the following sections I address the majority opinion's two main reasons for rejecting this conclusion: that Defendants took other measures to address the pandemic and that they lacked the authority to release detainees.

### 1.

The majority says that by taking other measures short of releasing detainees, Director Junior "has responded reasonably to the risk of the virus." Maj. Op. at 27. But his taking some steps to reduce the risk of COVID-19 does not excuse his

40

failure to take the most important step for ensuring detainee safety. That is an "urgent decrease" in the detained population of Metro West. Director Junior's knowing failure to do so supports a finding of deliberate indifference.

Under this Court's precedent, "good faith efforts" to resolve health risks are insufficient to overcome evidence that jail staff "recklessly disregarded the necessary means to protect inmate safety." LaMarca v. Turner, 995 F.2d 1526, 1538 (11th Cir. 1993). We know deliberate indifference may be shown by proving that a detention center knowingly took "an easier but less efficacious course of [medical] treatment." McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999). And this Court has also found deliberate indifference where prison staff delayed or "fail[ed] to provide service acknowledged to be necessary." Ancata, 769 F.2d at 704.

Here, the experts speak with one voice when they say reducing the population density at Metro West is "necessary" to reasonably prevent the spread of infection. Defendants were subjectively aware of the gravity of the threat posed by COVID-19. Director Junior familiarized himself with the CDC recommendations and communicated to jail staff that it was "now more important than ever that we all practice strict social distancing at all times, no exceptions." It cannot seriously be doubted that Director Junior knew decreasing the jail population was the most effective way to reduce the risk of infection. Despite this,

41

the population density of Metro West was still critically high at the time the preliminary injunction issued.

This record shows that Defendants recklessly failed to take the most essential step to ensuring the safety of Metro West detainees.  In light of this, I am not persuaded that the other measures implemented at Metro West in place of lowering the jail population were sufficient to preclude a finding of deliberate indifference.

2.

Defendants claim they cannot be found deliberately indifferent for their failure to address unsafe crowding at Metro West because they lacked the authority to release detainees without a state court order.  Unlike the majority, I do not think the scope of Defendants' authority under Florida law controls the outcome of the deliberate indifference inquiry.  Maj. Op. at 27 n.7.

State laws that compel jail officials to detain people in manifestly unsafe conditions cannot preclude a finding of deliberate indifference.  In <u>Smith v. Sullivan</u>, 611 F.2d 1039 (5th Cir. 1980),[3] our predecessor Court rejected a county sheriff's objection to a court order requiring him to decrease the total jail population on the grounds that it would "violate his statutory duty to accept

---

[3] In <u>Bonner v. City of Prichard</u>, 661 F.2d 1206 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981.

prisoners." Id. at 1043.  The Smith panel reasoned that an "allegedly contrary duty at state law" cannot "excuse the perpetuation of unconstitutional conditions of confinement."  Id. at 1044.  In the same way, this Court has held that state-imposed budget limitations "will not excuse the failure of correctional systems to maintain a certain minimum level of medical service necessary to avoid the imposition of cruel and unusual punishment."  Harris v. Thigpen, 941 F.2d 1495, 1509 (11th Cir. 1991); see also Costello v. Wainwright, 525 F.2d 1239, 1252 (5th Cir. 1976) ("[T]he obligation of [prison officials] to eliminate unconstitutionalities does not depend upon what the Legislature may do . . . ." (quotation marks omitted)), vacated in part on reh'g, 539 F.2d 547 (5th Cir. 1976) (en banc), rev'd, 430 U.S. 325, 97 S. Ct. 1191 (1977), and opinion reinstated, 553 F.2d 506 (5th Cir. 1977).  These cases reflect the longstanding rule that, in enforcing state law, officials may not knowingly detain people in jails that fall below the minimum constitutional standard of safety.  See DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. 189, 200, 109 S. Ct. 998, 1005 (1989) ("[W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment

43

and the Due Process Clause."); <u>Helling</u>, 509 U.S. at 33, 113 S. Ct. at 2481 (holding

it is cruel and unusual punishment to hold prisoners "in unsafe conditions").

If contrary state law obligations precluded finding deliberate indifference,

federal courts would be powerless to enjoin unconstitutional prison conditions

wherever state legislatures act to withhold prison officials' authority to remedy

them.  But this cannot be the rule.  In <u>Brown v. Plata</u>, 563 U.S. 493, 131 S. Ct.

1910 (2011), the Supreme Court affirmed relief given to address system-wide,

Eighth-Amendment-violative conditions of confinement caused by overcrowding

and lack of medical resources.  <u>See id.</u> at 500, 520–25, 131 S. Ct. at 1922, 1936–

39.  In doing so, the Supreme Court stood behind a court-imposed remedy even

though it required measures beyond the authority given to some jail officials under

state law.  <u>Compare</u> <u>Coleman v. Wilson</u>, 912 F. Supp. 1282, 1317 (E.D. Cal. 1995)

(finding that prison officials' lack of power or authority to address unconstitutional

prison conditions caused in part by overcrowding "does not necessarily

contraindicate scienter") <u>with</u> <u>Brown</u>, 563 U.S. at 500, 131 S. Ct. at 1922

(affirming remedial order of three-judge court convened at the request of the

<u>Coleman</u> court).  Congress has also empowered federal courts to exceed the

bounds of state law in order to correct violations of federal constitutional rights.

The Prison Litigation Reform Act ("PLRA") authorizes district courts to "require[]

or permit[] a government official to exceed his or her authority under State or local

44

law" when that relief is necessary to correct the violation of a federal right and no other relief is sufficient.  18 U.S.C. § 3626(a)(1)(B).  It is thus clear that federal courts may enjoin the knowing detention of people in unsafe conditions even when state law compels that detention.

This Court's precedent interpreting Ex parte Young, 209 U.S. 123, 28 S. Ct. 441 (1908), further supports the idea that Director Junior's state law obligations to the contrary do not preclude finding deliberate indifference.  Under Young, a plaintiff may seek prospective injunctive relief to remedy ongoing state violations of federal law by suing a state official in his official capacity.  See Fla. Ass'n of Rehab. Facilities, Inc. v. Fla. Dep't of Health & Rehab. Servs., 225 F.3d 1208, 1219 (11th Cir. 2000).  This type of remedy is "designed to end a continuing violation of federal law" and is "necessary to vindicate the federal interest in assuring the supremacy of that law."  Id. (quotation marks omitted); see also Green v. Mansour, 474 U.S. 64, 68, 106 S. Ct. 423, 426 (1985) ("[T]he availability of prospective relief of the sort awarded in Ex parte Young gives life to the Supremacy Clause.").  Here, Director Junior has repeatedly insisted that state law leaves him no discretion to release detainees even though continuing to detain them places them at a significantly heightened risk of contracting COVID-19.  But if it is his non-discretionary, ministerial role in enforcing state laws that creates

unsafe conditions of confinement in Metro West, he may properly be sued for injunctive relief.  See Luckey v. Harris, 860 F.2d 1012, 1015–16 (11th Cir. 1988).[4]

Because Plaintiffs seek injunctive relief against Director Junior in his capacity as a state official, they are not required to prove he personally disregarded the risk to their safety.  In suits against state officials acting pursuant to state authority, "[p]ersonal action by defendants individually is not a necessary condition of injunctive relief."  Luckey, 860 F.2d at 1015.  Director Junior's continuing enforcement of state law has created widespread, untenably dangerous conditions for Metro West detainees and staff.  And when state and local officials knowingly fail to meet their affirmative constitutional obligation to ensure safe jail conditions, "judicial authority may be invoked."  Hutto v. Finney, 437 U.S. 678,

---

[4] That Director Junior is employed by Miami-Dade County, not the state of Florida, does not likely make him an improper defendant under Ex parte Young.  A municipal official who "commits an alleged constitutional violation by simply complying with state mandates that afford no discretion . . . act[s] as an arm of the State, not the county."  McNeil v. Cmty. Prob. Servs., LLC, 945 F.3d 991, 995 (6th Cir. 2019) (alteration adopted) (quotation marks omitted); see also Moore v. Urquhart, 899 F.3d 1094, 1103 (9th Cir. 2018) (holding that "[a]ctions under Ex parte Young can be brought against both state and county officials"), cert. denied sub nom. Johanknecht v. Moore, 139 S. Ct. 2615 (2019); Huminski v. Corsones, 396 F.3d 53, 73 (2d Cir. 2005) (finding a county sheriff was "likely a state official when he was performing his general duties for the sheriff's department, particularly when he was acting pursuant to state law"); Scott v. O'Grady, 975 F.2d 366, 371 (7th Cir. 1992) (observing that "[t]he fact that [county sheriffs] normally act as county officials does not mean that they can never act as an arm of the state" and holding a function as an arm of the state when he had no discretion in enforcing state court order).  In this Circuit, we determine whether a county sheriff was a state or municipal official for purposes of Eleventh Amendment liability, by examining "how state law defines the entity, what degree of control the state maintains over the entity, where funds for the entity are derived, and who is responsible for judgment against the entity."  Hufford v. Rodgers, 912 F.2d 1338, 1341 (11th Cir. 1990).

46

687 n.9, 98 S. Ct. 2565, 2572 n.9 (1978) (quotation marks omitted).  A rule that

precludes federal judges from enjoining dangerous jail conditions mandated by

state law would require those judges to abdicate a core function of their office.[5]

## B.

Setting aside Defendants' failure to reduce Metro West's population, I am

also not persuaded Defendants took sufficient steps to minimize the risk of

transmission at that unsafe population level.  The District Judge rejected

Defendants' assurances that "everything that could be done was being done" and

found that the record "does not unequivocally demonstrate successful

implementation of the policies, protocols and procedures identified in their

declarations."  This record supports her finding.  The majority describes in detail

the remedial measures Defendants claim to have taken, noting that the District

Court accepted those claims.  Maj. Op. at 21–24.  However, the District Court also

set out in great detail the statements of the people detained at Metro West, which

paint a far different picture.[6]  Together, they support the finding that Defendants

---

[5] The majority worries that finding deliberate indifference despite a lack of legal authority to act would mean that "any person with physical capacity to provide relief to an inmate" could be held deliberately indifferent.  Maj. Op. at 27 n.7.  I do not share this concern.  Young defines a narrower range of parties who may be sued in their official capacity to remedy unconstitutional jail conditions mandated by state law.  That is those who, by virtue of their office, have a connection to the unconstitutional act or conduct taken under requirement of state law.  Luckey, 860 F.2d at 1015–16.

[6] The majority notes that the District Court did not resolve factual disputes about the implementation of Defendants' policies and procedures.  I do not fault the majority for its careful

systematically failed to implement policies adequate to ensure detainee safety at

this high population level.  This is sufficient, in my view, to support a finding of

deliberate indifference.

In declarations submitted in support of Plaintiffs' motion for a preliminary

injunction, Metro West detainees describe beds placed so close together they can

reach out and touch neighboring bunks.  Tending to even their most basic daily

needs requires close contact with other detainees.  The limited showers, toilets, and

telephones are placed close together and they are shared by up to 60 people.

Detainees say it is often difficult or impossible to clean shared surfaces, such as

phones, because they are not provided with disinfectant or other cleaning supplies.

Defendants tell us that all staff and detainees are required to wear masks, but it

appears adherence to this requirement is problematic.  At the time the injunction

was issued, detainees were each given a mask approximately once a week, but the

---

exegesis of the District Court's order, but I think this degree of scrutiny applied to the scope of
the District Court's factual findings is misplaced.  See Maj. Op. at 16–20.  Our review of
preliminary injunction orders is meant to be "deferential" due to the expedited nature of
preliminary injunction proceedings.  See Jones v. Governor of Fla., 950 F.3d 795, 806 (11th Cir.
2020) (per curiam).  In the preliminary injunction setting, district courts are in the unenviable
position of both evaluating the viability of a plaintiff's claims and balancing the equities of the
case on an emergency timeline.  See id.

    The majority also faults Plaintiffs for raising arguments which the District Court did not
address in the preliminary injunction order, including Defendants' failure to implement
"feasible" social distancing measures.  See Maj. Op. at 24–25.  It is a mistake to hold this against
Plaintiffs.  After all, an appellee who does not take a cross-appeal may urge affirmance based on
"any ground that finds support in the record," including through arguments at odds with the
reasoning of the lower court.  Jaffke v. Dunham, 352 U.S. 280, 281, 77 S. Ct. 307, 308 (1957)
(per curiam); see also Jennings v. Stephens, 574 U.S. 271, 276, 135 S. Ct. 793, 798 (2015).

masks are "soft," "rip a lot," and "get really dirty." Sometimes the masks break after "two to three days." Despite this, detainees are not always provided with replacements for broken masks and may be chastised or threatened with disciplinary action if they request a new one.

The detainee declarations also suggest Defendants have implemented policies that make it impossible to maintain adequate distancing. For example, three times a day, detainees must line up "shoulder-to-shoulder," less than three feet apart, to be counted. Detainees also participate in mandatory outdoor recreation in a space shared with people from quarantined cells. Before going outside, they are lined up less than a foot apart for pat-down inspections. Three days can pass between placing a sick call and receiving medical attention. Trips to the clinic are made in groups of eight to ten and, once there, detainees must wait "shoulder-to-shoulder," sometimes with people from other cells.

Taken together, the repeated failures to enact adequate social distancing measures documented in these declarations are sufficient to demonstrate a systemic, institutional pattern of deliberate indifference. The majority opinion is not sufficiently attentive to the way our Circuit has historically addressed deliberate indifference claims based on widespread unconstitutional conditions within a jail or prison. In cases like these, this Court has held that systemic deliberate indifference may be proved through a series of related examples that

49

demonstrate a pattern of "indifference . . . to the suffering that results." <u>Thigpen</u>, 941 F.2d at 1505 (quotation marks omitted).   We have allowed plaintiffs to show deliberate indifference through a pattern of "systemic deficiencies" or "[r]epeated examples of delayed or denied medical care." <u>Rogers v. Evans</u>, 792 F.2d 1052, 1057–59 (11th Cir. 1986).  Similarly, a series of incidents closely related in time "may disclose a pattern of conduct amounting to deliberate indifference." <u>Id.</u> at 1058–59.  In light of the plaintiffs' evidence here, I believe they are likely to prove a reckless failure to take medically necessary safety precautions at Metro West.

Remarkably, Defendants have not defended the practices attested to in the detainee declarations.  The majority correctly points out that the CDC's recommendations recognize that "[s]trategies will need to be tailored to the individual space in the facility and the needs of the population and staff."  Maj. Op. at 22 (alteration in original).  Nevertheless, Defendants have given no explanation of why the actual conditions described by detainees were reasonably tailored to Metro West's needs.  With this gap in the evidentiary record, the District Court was not required to credit Director Junior's assertion that the measures he implemented were adequate.  "[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." <u>Hale v. Tallapoosa County</u>, 50 F.3d 1579, 1583 (11th Cir. 1995) (quoting <u>Farmer</u>, 511 U.S. at 842, 114 S. Ct. at 1981).

The majority opinion also places too much weight on the broad, laudatory preamble to Dr. Jayaweera and Dr. Tookes' court-ordered inspection report, which praised Metro West staff for "doing their best balancing social distancing and regulation applicable to the facility." Maj. Op. at 7, 22, 24, 26. It appears the District Court either discredited or declined to give dispositive weight to this portion of the report, because it did not mention this language anywhere in the preliminary injunction order. Under the circumstances, this was not clear error. Over Plaintiffs' objection, Dr. Tookes and Dr. Jayaweera's inspection was conducted at a predetermined time and was limited to predetermined locations within the jail. And this record includes declarations from detainees stating that immediately before the inspection Metro West staff made numerous last minute changes, including moving people out of cells that were going to be inspected so they would be less crowded; restocking toilet paper and soap; painting bathroom walls to cover black mold; scrubbing down cells; and placing additional soap in the unit. There are also post-inspection declarations that document widespread failure to implement adequate social distancing measures. I therefore see no error in the District Court's decision to give no weight to the notion that Metro West staff were doing their best.

## II.

In closing, I will briefly describe why I part ways with the majority's analysis of what it describes as "threshold issues": municipal liability under Monell v. Department of Social Services, 436 U.S. 658, 86 S. Ct. 2018 (1978), and the PLRA's administrative exhaustion requirement.  Maj. Op. at 28.

Under Monell, a plaintiff seeking to hold a municipality liable for a constitutional violation must identify either an officially promulgated county policy or an unofficial custom or practice shown through the acts of a final policymaker.  Grech v. Clayton County, 335 F.3d 1326, 1329 (11th Cir. 2003).  I agree with the majority that, typically, district courts should address municipal liability in evaluating whether plaintiffs proceeding against a municipality are likely to succeed on the merits.  Maj. Op. at 28–29.  But I've set out why I think Plaintiffs may properly proceed against Director Junior as a state official under Ex parte Young.  See supra, pages 45–47 & n.4.  If Plaintiffs can get their desired relief by proceeding against Director Junior in his capacity as a state official, I don't believe they are required to also show that they will prevail on their claims against Miami-Dade County under Monell.

Neither do I think the District Court erred in deferring its ruling on exhaustion.  Defendants' brief in opposition to the preliminary injunction included a scant two paragraphs of argument on administrative exhaustion and no citations

to the record.  But they tried to incorporate the arguments they made about exhaustion in a separate motion that is 97 pages long, including a 13-page brief and 84 additional pages of exhibits.  That motion was filed on a different briefing schedule, and Plaintiffs had not yet responded to Defendants' filing at the time the District Court ruled on the preliminary injunction.  The District Court found that Defendants' opposition to the preliminary injunction improperly attempted to incorporate by reference their separate motion to dismiss for failure to exhaust.

Our Court certainly would not opine on an issue that was merely incorporated by reference by one party and not fully briefed (for lack of opportunity) by the other.  I am aware of no basis for requiring district judges to live by a different standard.  Beyond that, administrative exhaustion is an affirmative defense for which Defendants bear the burden of proof.  See Jones v. Bock, 549 U.S. 199, 212, 127 S. Ct. 910, 919 (2007); Turner v. Burnside, 541 F.3d 1077, 1082 (11th Cir. 2008).  Before ruling on exhaustion, a district court must ensure the plaintiff has "sufficient opportunity to develop a record."  Bryant v. Rich, 530 F.3d 1368, 1376 (11th Cir. 2008).  And although proving exhaustion is a "precondition to an adjudication on the merits," it is not jurisdictional and may be raised by Defendants at various times in the course of litigation.  Id. at 1374 & n.10.

Here, the District Court acted well within its discretion when it rejected Defendants' attempts to incorporate a separate, sizeable filing into its brief. This Court traditionally gives "great deference to a district court's interpretation of its local rules," Clark v. Hous. Auth. of City of Alma, 971 F.2d 723, 727 (11th Cir. 1992), including its authority to enforce page limitations, Yates v. Cobb Cty. Sch. Dist., 687 F. App'x 866, 868 (11th Cir. 2017) (per curiam) (unpublished). Certainly our Court actively polices its own page limits requirements. For example, we have said that an attempt to incorporate by reference 25 pages of lower-court briefing into an appellate brief "makes a mockery of our rules governing page limitations and length." Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr S.A., 377 F.3d 1164, 1167 n.4 (11th Cir. 2004). I would do the District Judge the courtesy of allowing her, in turn, to manage her own docket and page limits.

### III.

The COVID-19 pandemic is a global health crisis that has taken the lives of thousands and strained every level of our society and government. But crises do not lower the constitutional limits on the conditions in which people may be confined against their will. People held in prisons and detention centers are among the most vulnerable to the ravages of this devastating illness. I do not understand the Fourteenth Amendment to permit the knowing and willful detention of human

beings in circumstances that place them at great risk of death or grave illness.  I would affirm the District Court Order granting Plaintiffs' motion for a preliminary injunction.

I respectfully dissent.